UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the ) <br> FORT TOTTEN METRORAIL CASES ) <br> Arising Out of the Events of June 22, 2009 ) <br> ) <br> ) <br> LEAD CASE: <u>Jenkins v. Washington</u> ) <br> <u>Metropolitan Area Transit Authority, et al.</u> ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ALL CASES ) <br> ) | Case No.: 10mc314 (RBW) |

**Memorandum Opinion**

This Order addresses an issue that remained unresolved after the November 4, 2010 hearing on the Washington Metropolitan Area Transit Authority's ("WMATA") motion to dismiss Counts IV and XIII of the plaintiffs' Second Amended Master Complaint ("Compl."), alleging Negligence – Disabling of Warning Alarms in the Operations Control Center based on the doctrine of sovereign immunity. The Court now concludes that these claims must be dismissed.

**I. Introduction**

In Counts IV and XIII of their Second Amended Master Complaint, the plaintiffs assert negligence claims against WMATA,[1] Compl. ¶¶ 214-20, 277-83, on the grounds that WMATA reprogrammed its train monitoring alarm system making warnings "consistent with loss of train detection" both self-acknowledging and self-deleting. Id. ¶ 217. Specifically, the plaintiffs allege that "bobbing," a phenomenon where "an isolated track circuit transitions from vacant, to occupied[,] and back to vacant again," prior to the

---
[1] Count XIII is also pleaded against defendant ARINC. This opinion resolves only the claim pleaded against WMATA.

reprogramming of the monitoring alarm system, triggered "alarms for loss of train detection" that required acknowledgment by controllers in the Operation Control Center ("OCC"), id. ¶¶ 168, 280, but because "bobbing had become such a frequent occurrence, WMATA[,] in coordination with defendant ARINC[,] deliberately reprogrammed their computer system to automatically erase these alarms," id. ¶ 280. The plaintiffs argue that this decision was "reckless," id. ¶ 281, and absent such action "an OCC controller likely would have communicated with Train 112 and the June 22, 2009 collision likely would have been avoided," id. ¶ 282.

Commenting on this subject, the National Transportation Administration Safety Board ("NTSB") Report states:

> The inbound main track . . . between the Takoma and Fort Totten stations is divided into 27 track circuits. The automatic block system detects trains as they occupy and vacate each of these track circuits and transmits this information through remote terminal units to the [Advanced Information Management ("AIM")] computer system at the OCC.
> . . . .
> The AIM system is designed to display, and in some cases sound, an alarm whenever certain patterns are detected in track occupancy data. In general, alarms that are classified as "major" must be acknowledged by the appropriate line controllers and be manually deleted (usually by the Metrorail maintenance operations center [MOC], which is a separate console within the OCC). Typically, alarms classified as "minor" can be manually acknowledged and deleted in the same manner as major alarms, but if a minor alarm remains unacknowledged after 60 seconds, the computer will automatically acknowledge and delete it.
>
> When the AIM software detects that a normal main line track circuit is reporting as occupied in isolation (neither in front of nor behind a train), it issues a "track-circuit-failed-occupied" train tracking alarm. . . . According

> to [the] OCC records, track-circuit-failed-occupied alarms occur at the rate of about 5,000 per week.
>
> When the AIM software detects that a track circuit reports as unoccupied under certain preprogrammed conditions, it issues a "track-circuit-failed-vacant" train tracking alarm. . . . The algorithm used to trigger [a non-reporting block ("NRB")] alarm may be described as follows: The AIM system creates a virtual train whenever two adjacent track circuits indicate simultaneous occupancy. If one or two new track-circuit occupancy indications then occur "downstream" (in the direction of travel) of the virtual train, any intermediate track circuit that indicates "unoccupied" will generate an NRB alarm. If both previously occupied track circuits indicate "unoccupied" without the track circuit downstream from these indicating "occupied," both of the previously occupied track circuits will generate NRB alarms. If a train occupies three or more track circuits and one or more of the intermediate track circuits indicates "unoccupied," those unoccupied track circuits will generate NRB alarms. . . . According to [the] OCC records, NRB track-circuit-failed-vacant alarms occur at the rate of about 3,000 per week.
>
> The AIM software responds to a "bobbing" track circuit (a track circuit malfunction in which a track circuit transitions from vacant, to occupied, to vacant again with no train traffic present) by issuing a cascade of track-circuit-failed-occupied/failed-vacant alarms. Because of the high incidence of bobbing track circuit alarms, WMATA has designated track-circuit-failed-occupied/failed-vacant alarms as minor alarms. Loss of train detection is a different type of track circuit malfunction .

National Transportation Safety Board, Railroad Accident Report 10/02: Collision of Two Washington Metropolitan Area Transit Authority Metrorail Trains Near Fort Totten Station Washington, D.C. June 22, 2009, <u>available at</u> http://www.ntsb.gov/publictn/2010/RAR1002.pdf ("NTSB Report") at 27-29 (footnotes omitted). It is these two alarm triggering events described in the NTSB Report that the plaintiffs contend should have been maintained as major rather than minor alarms, and

that WMATA was negligent in reprogramming the designation of the alarms. WMATA argues, on the other hand, that its decision to designate theses alarms as minor was a decision protected by the doctrine of sovereign immunity.

## II. Analysis

WMATA was created by an interstate compact between Maryland, Virginia, and the District of Columbia with the consent of Congress. Sanders v. WMATA, 819 F.2d 1151, 1154 (D.C. Cir. 1987). WMATA has sovereign immunity, Morris v. WMATA, 781 F.2d 218, 219-20 (D.C. Cir. 1986), which is waived, inter alia, for torts committed in the exercise of its proprietary functions, but not for the commission of any torts resulting from its governmental conduct, id. at 220. Actions that are "quintessentially governmental," such as the operation of a police force, or that require the exercise of discretion under certain circumstances, constitute governmental conduct and WMATA's immunity is not waived when performing such activities. Abdulwali v. WMATA, 315 F.3d 302, 304 (D.C. Cir. 2002). And acts are considered discretionary, in the context of sovereign immunity, if they involve judgment decisions "grounded in social, economic, or political policy." Sanders, 819 F.2d at 1155; see Abdulwali, 315 F.3d at 304 (applying the test that distinguishes governmental and non-governmental activities in Federal Torts Claims Act cases to WMATA Compact cases).

WMATA argues that Counts IV and XIII of the complaint should be dismissed on the grounds of sovereign immunity because the plaintiffs

> attempt to hold WMATA liable for the design of the automatic train control and safety system used in its Operations Control Center . . . [and] to hold WMATA liable for decisions made "to disable the warning alarm system"-i.e., decisions WMATA made as to how to

4

> manage alarms that were issued by the OCC system based on input from the field devices.

WMATA's Memorandum In Support of Its Motion to Dismiss Those Portions of the Master Complaint That Are Barred by the Doctrine of Sovereign Immunity ("WMATA's Mem.") at 30. WMATA posits that the plaintiffs' allegations relate to the design of the safety warning system and how to "manage and address problems with the alarms," decisions which "required the exercise of policy-based discretion, [and] WMATA is protected by its sovereign immunity from these allegations." Id.

WMATA characterizes alarm management as "a complex problem presented in the design of the automatic train control and safety system" and contends that its decision to make bobbing circuit alarms minor and thus "self-acknowledging/self-deleting" alarms was driven by concern that these frequent alarms "could result in obscuring critical alarms that require prompt attention from the controller, and that the time needed to address these alarms would also divert the controller from his or her other critical responsibilities for the system." WMATA's Mem. at 32 (footnote omitted). WMATA further asserts that "[q]uestions such as how to design and manage the safety warning system and how to prioritize and designate the various types of alarms" were design and planning decisions protected by sovereign immunity, whether made in the original design or "in response to a recognized problem with the amounts of alarms generated by the original system." Id. at 33-34. WMATA contends that its decision is "susceptible to policy analysis" because

> [t]he options presented by the problem all involved major undertakings which would have required the weighing of costs, benefits, the allocation of resources (including the evaluation of issues such as the need for additional staff to address the overwhelming amount of alarms generated by

5

> the OCC and all the other OCC controller tasks) and alternatives as to how to maintain the safe operation of the Metrorail system.

Id. at 34. WMATA cites two District of Columbia Circuit cases in support of its position, Souders v. WMATA, 48 F.3d 546, 547-50 (D.C. Cir. 1995) (dismissing nuisance claims on grounds of sovereign immunity even though WMATA noise level standards exceeded the maximum level permitted by noise pollution law in the area) and Sanders, 819 F.2d at 1152, 1156 (finding WMATA's rule requiring drug testing of those employees "involved in on-the-job accidents or unusual operating incidents" was protected from the employees' lawsuit under the doctrine of sovereign immunity because the "rule was certainly grounded in the social, political, and regulatory activities of WMATA").

In their opposition to WMATA's motion, the plaintiffs argue that WMATA is not entitled to sovereign immunity because: (1) reprogramming the alarms represented negligent maintenance of its system of train detection; and (2) the designation of the alarms was prescribed by specific directives created by WMATA's internal policies. Plaintiffs' Opposition to Defendant WMATA's Motion to Dismiss Those Portions of the Master Complaint That Are Barred by the Doctrine of Sovereign Immunity ("Pls.' Opp'n") at 33-36. In an attempt to clarify what they are asserting in their complaint, the plaintiffs state in their opposition:

> Counts IV and XIII are substantively the same and allege that WMATA was negligent in deliberately reprogramming its computer system to automatically erase alarms, without requiring any operator acknowledgment, that alerted WMATA to a loss of shunt, that is, a loss of train detection when a train is present. As discussed above, a loss of shunt is an extremely dangerous condition that WMATA's own guidelines acknowledge "could lead to a rear-end collision." (WMATA-GEN-00010928, Exhibit A) Yet, when alarms sounded notifying WMATA of this

6

> dangerous condition, it chose to ignore them at the peril of
> its passengers. Rather than fix the dangerous loss of shunt
> problem that was causing the alarms, WMATA alleges that
> too many alarms were being generated and that is why it
> programmed the alarms to just turn off after a short period
> of time without having to be acknowledged by an
> employee. (Defendant WMATA's Memorandum at 32)
> Thus, WMATA negligently failed to maintain its system of
> train detection and the alarm system. It was as if WMATA
> had burning fires all over its tracks, but rather than put
> those fires out, it became annoyed with all the smoke
> alarms and so it programmed them to automatically turn off
> once triggered.

Id. at 33 (footnote omitted). In the footnote incorporated into this passage, the plaintiffs further explain: "Counts IV and XIII also allege WMATA negligently turned off the alarms that alerted WMATA to the 'bobbing' condition as well, which is when the system incorrectly displays that a train is present when one is not present, as opposed to shunting, which incorrectly displays that no train is present when one is, in fact, present." Id. at 33 n.7.

The plaintiffs also allege that designating the "loss of shunt alarms" as minor alarms was an action in contravention of specific directives created by WMATA internal policies. Id. at 33-35. They argue that the existence of specific directives eliminated WMATA's discretion and thus defeats its claim of sovereign immunity. See Berkovitz v. United States, 486 U.S. 531, 536-37 (1988). Specifically, the plaintiffs claim that WMATA's decision was not discretionary due to "its own written policies," Pls.' Opp'n at 33, contained in its June 12, 2005 Engineering Bulletin & Automatic Train Control Safety Notice to all Automatic Train Control Personnel ("Engineering Bulletin") and its Automatic Train Control System Integrity Maintenance Practices Rev. 1: 03/2512003 ("Maintenance Practices"). Id. at 33-34. As support for their position, the plaintiffs

7

quote a section of WMATA's Engineering Bulletin, which states: "Diminished shunt sensitivity can cause a partial loss of train detection in an affected track circuit . . . [and] could lead to a rear-end collision. Early detection of this problem is <u>imperative</u>." Id. at 34 (emphasis added by the plaintiffs). And they quote a section from the Maintenance Practices, which states:

> When any component the functioning of which is essential to the safe movement of trains, fails to perform its intended restricting safety function or is not in correspondence (not in agreement) with known operating conditions, train movements dependent on the normal functioning of such circuit or device shall be prohibited or protected by alternate means until repairs are complete.

<u>Id.</u> The plaintiffs allege that these statements establish that the manner in which WMATA responded to alarms "demonstrating a loss of shunt" was not discretionary, but rather "was explicitly required to 'prohibit[] or protect[] by alternate means' all 'train movements dependent on the normal functioning of such circuit or device,' until repairs on that circuit or device were 'complete,'" and that WMATA "utterly failed to do either of these things." <u>Id.</u> at 34-35.

In its reply, WMATA reiterates that the designation of alarms is a policy decision, and further contends that the plaintiffs understanding of the concept of loss of shunt is misguided because loss of shunt resulting in a loss of train detection is different from loss of shunt resulting in loss of speed commands. WMATA's Reply Memorandum In Support of its Motion to Dismiss Those Portions of the Master Complaint That Are Barred by the Doctrine of Sovereign Immunity ("WMATA's Reply") at 23. Importantly, however, WMATA argues that "the distinctions between the[] two track conditions are not critical to a discretionary function analysis," <u>id.</u> at 23-24, because a "[s]overeign

8

immunity analysis focuses on the type of decision, and whether [such a decision] is susceptible to policy analysis." Id. at 24 (citing United States v. Gaubert, 499 U.S. 315, 323 (1991)). Therefore, WMATA asserts that "the important distinction must be seen between (1) the decisions WMATA made regarding the designation of the alarms received by the Operations Control Center, and (2) WMATA's efforts to identify, repair, and adopt maintenance procedures to prevent the problem causing the alarms." WMATA's Reply at 24.

As a preliminary matter, the Court appreciates that there is a dispute between the parties as to what activity WMATA's alarm systems were capable of detecting, and whether the OCC would have been alerted by the alarm systems of the malfunction the plaintiffs contend contributed to the event that is the subject of this litigation. Compl. ¶ 217; WMATA's Reply at 23 & n.7.[2] However, this dispute is not relevant to the issue the Court must decide, which is whether WMATA's decision to reprogram its alarm system amounted to a discretionary call grounded in social, economic, or political policy considerations in assessing whether it is entitled to sovereign immunity with respect to Counts IV and XIII of the Complaint.

Both parties have referred the Court to Cope v. Scott, 45 F.3d 445 (D.C. Cir. 1995), as support for their respective positions.[3] In Cope, a motorist injured in an

---

[2] The Court notes that despite the dispute as to what exactly was detectable by the alarm system, the NTSB Report's findings appear to represent that, for the particular malfunction that was determined to be responsible for the accident, the event could have been detected and confirmed only by testing performed by engineering crews, not through the sounding of an alarm. Id. at 39-40, 45-46, 65, 71, 83-84; WMATA's Reply at 23 & n.7.

[3] In advancing their respective arguments, both parties emphasize the following quotation from Cope: "[W]e have consistently held that the discretionary function exception applies only where 'the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency.'" 45 F.3d at 450 (quoting Blessing v. United States, 447 F. Supp. 1160, 1170 (E.D. Pa. 1978).
(continued . . .)

accident that occurred on a road in Rock Creek Park "maintained by the National Park Service," id. at 446, sued the Park Service, alleging, inter alia, that it was negligent "in failing to appropriately and adequately maintain the roadway . . . and failing to place and maintain appropriate and adequate warning signs along the roadway," id. at 447. The district court granted summary judgment to the Park Service on both claims and the District of Columbia Circuit affirmed the ruling on the claim concerning maintenance of the roadway. Id. at 452. In reaching this conclusion, the Circuit noted that the record established that "no regular maintenance would have prevented the road from deteriorating" in the way [the plaintiff] allege[d]," i.e., the road having "inadequate skid resistance," which "could have been prevented only by reducing the traffic load, initially paving it with a different surface, resurfacing the curve entirely, or at least milling the curve to create grooves in the surface." Id. at 451. The Circuit found, based on an engineering study of roads in Rock Creek Park, that "[d]etermining the appropriate

---

(. . . continued)
Research into the origin of this quotation reveals that this language was not intended as a test to delineate when the discretionary function exception applies, but rather is an explanation for the rationale underlying the very existence of the discretionary function exemption. Those words were first expressed by Judge Edward Becker while sitting as a district judge prior to his appointment as a judge on the Third Circuit. The full text of the paragraph from which the words are taken is the following:

> Statutes, regulations, and discretionary functions, the subject matter of [28 U.S.C.] § 2680(a), are, as a rule, manifestations of policy judgments made by the political branches. In our tripartite governmental structure, the courts generally have no substantive part to play in such decisions. Rather, the judiciary confines itself or, under laws such as the FTCA's discretionary function exception, is confined to adjudication of facts based on discernible objective standards of law. In the context of tort actions, with which we are here concerned, these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

Blessing, 447 F. Supp. at 1170 (footnotes omitted).

course of action would require balancing factors such as the [road's] overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards." Id. Consistent with Supreme Court precedent, the Circuit concluded that "such decisions require the agency to establish priorities for the accomplishment of its policy objectives, by balancing the objective sought to be obtained against such practical considerations as staffing and funding." Id. (quoting United States v. Varig Airlines, 467 U.S. 797, 820 (1984)). And as the Supreme Court refused to do in Varig, the Circuit in Cope "declined to 'second guess' those judgments." Id. (quoting Varig, 467 U.S. at 820).

The court in Cope, however, vacated the district court's grant of summary judgment regarding the claim asserting that there was inadequate signage warning users of the condition of the road's surface. Id. In reaching this result, the court stated, "we find that the discretion regarding where and what type of signs to post is not the kind of discretion protected by the discretionary function exception," because it was not a judgment "fraught with public policy considerations." Id. The court found the Park Service's arguments related to engineering principles and aesthetic considerations unconvincing, concluding:

> Here, the Park Service has chosen to manage the road in a manner more amenable to commuting through nature than communing with it. Having done so, and having taken steps to warn users of dangers inherent in that use, the Park Service cannot argue that its failure to ensure that those steps are effective involves protected "discretionary" decisions.

Id. at 452. The Cope case thus demonstrates that the discretionary function exemption applies only where the government demonstrates that it not only had to make a

11

discretionary decision but also that the decision was "fraught with public policy considerations." Id. at 451-52.

A case from the United States Court of Appeals for the Fourth Circuit sheds light on the type of decisions considered "fraught with public policy considerations" in the context of WMATA's metrorail system. Smith v. WMATA, 290 F.3d 201 (4th Cir. 2002). In Smith, a passenger "suffered a fatal heart attack" as he "climbed [Escalator One at one of the system's underground stations] which was being utilized as a stairway, i.e., a 'stationary walker.'" Id. at 203. The passenger was at the Bethesda station, which could normally be accessed by way of three escalators and an elevator. Id. On the day of Smith's death, however, "Escalator Two" had failed a safety inspection and a safety inspector refused to allow it to be used as either an escalator or a stationary walker, and "Escalator Three" was "in a state of disassembly awaiting a replacement part" after a problem was uncovered during routine maintenance. Id. at 204. WMATA thus "made the decision to utilize its sole operating escalator[, Escalator One,] as a stationary walker." Id. Smith's parents sued WMATA alleging that it was negligent in (1) "brak[ing] Escalator One for use as a stationary walker"; (2) le[aving] Escalator Three disassembled pending repair; (3) "fail[ing] to warn its Bethesda patrons of the conditions"; and (4) "fail[ure] to repair and maintain Escalators Two and Three."[4] Id.

The Fourth Circuit held that WMATA's decision to use Escalator One as a stationary walker constituted an exercise of discretion entitled to immunity under circumstances where it had to make a choice to use Escalator One as a stationary walker or operate Escalator One in the up or down direction, forcing patrons moving in the

---

[4] There was an additional theory of negligence not before the Fourth Circuit on appeal as a result of a lower court ruling regarding proximate cause. Smith, 290 F.3d at 211.

12

opposite direction to use the elevator.  Id. at 208-09.  The court emphasized that WMATA was "[f]aced with what plainly constituted an emergency situation . . . [and t]here being no statutory or regulatory mandate specifically governing METRO's actions in response to that situation, the METRO personnel . . . were forced to make difficult choices."  Id.  And, because "[t]here were potential economic and political costs to the METRO in choosing between such unattractive resolutions of its problem . . . [, including] public outrage, adverse media coverage, or political fallout . . . [, it had to make a choice that was] plainly a decision 'susceptible to policy judgment.'"  Id. at 209.  Accordingly, the Fourth Circuit found that WMATA's "decision not to reassemble Escalator Three for use during rush hour on [the day the decedent suffered his heart attack was] also a governmental decision shielded by the discretionary function . . . [because] the potential choices implicated the ecopolicy of METRO, i.e., whether it was more cost-effective to reassemble Escalator Three pending repair, or whether to wait until replacement parts arrived."  Id. 209-10.  This was true, the Court concluded, "[e]ven if this decision had been incorrect, and even if it had constituted an abuse of discretion." Id. at 210.  WMATA was also found to be immune by operation of the discretionary function exemption for "its alleged failure to properly warn its Bethesda patrons of the inoperative status of Escalators Two and Three."  Id.[5]

Smith illustrates the "type of decision . . . [courts have found to be] grounded in social, economic, or political policy," Cope, 45 F.3d at 449, and the "flexibility", id. at

---

[5] The only theory upon which the court remanded the case to the district court was on the plaintiffs' claim that WMATA had "negligently failed to repair and maintain" the two inoperable escalators.  Smith, 290 F.3d at 211.

13

450, courts must accord to decisions that are "fraught with public policy considerations," id. at 451.

Here, WMATA contends that its redesignation of the track alarms about which the plaintiffs complain in Counts IV and XIII of their Complaint was implemented due to "the cascading amount of alarms generated by the failsafe automatic train safety system." WMATA's Mem. at 34. This large number of alarms, which WMATA considered "not critical to the OCC controller[s]," caused WMATA "concern[] that this situation could result in obscuring critical alarms that required prompt attention from the controller[s], and that the time needed to address these alarms would divert the controller[s] from [their] other critical responsibilities for the system." Id. at 32. WMATA represents that

> [t]he options presented by the problem all involved major undertakings which would have required the weighing of costs, benefits, allocation of resources (including the evaluation of issues such as the need for additional staff to address the overwhelming amount of alarms generated by the OCC and all the other OCC controller tasks) and alternatives as to how to maintain the safe operation of the metrorail system.

Id. at 34. And WMATA argues that these "social and economic judgments," id., are the type of discretionary decisions "protected by sovereign immunity," WMATA's Reply at 25.

The Court agrees that it cannot second-guess WMATA's decision to reprogram its alarm system and designate the alarms that are the subject of Counts IV and XIII as minor rather than major alarms. The NTSB Report verifies that the two alarms at issue, the "'track-circuit-failed-occupied' train tracking alarm" and the "'track-circuit-failed-vacant' train tracking alarm," were collectively activated at the rate of 8,000 per week. NTSB Report at 28. This high volume of alarm activity coupled with the implications

resulting from the volume clearly supports WMATA's assessment that its redesignation of the alarms was a discretionary decision "fraught with public policy considerations." Cope, 45 F.3d at 451.

In addition, the Court agrees with WMATA that the mandatory directives cited by the plaintiffs in their filings represent general safety obligations rather than internal policies dictating how the alarm system must be operated specifically. Like the situation in Smith, "there [was] no statutory or regulatory mandate specifically governing the METRO's actions in response to" the high volume of alarms, and "the METRO personnel . . . were forced to make [a] difficult choice[]." Smith, 290 F.3d at 209; see also WMATA's Mem. at 33 (stating that "[n]o statute or regulation prescribed the manner or methods of the OCC system, and there was no requirement that the system even include[] alarms, let alone [a] designat[ion of the] priority" they should be given). WMATA's decision concerning how the alarms should be designated required "balancing factors such as [the alarms'] overall purpose, the allocation of funds among [other demands, and] the safety [of passengers]," in addition to other considerations. See Cope, 45 F.3d at 451. Therefore WMATA's decisions "were much like the [policy] decisions exempted by the Supreme Court in Varig[, and] such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." Id. at 451 (quoting Varig, 467 U.S. at 820); see also Smith, 290 F.3d at 209 (stating that "[t]here were potential economic and political costs to the METRO in choosing between such unattractive resolutions of its problem . . . [, including] public outrage, adverse media coverage, or political fallout . . . [, and it had to make a choice

that was] plainly a decision 'susceptible to policy judgment'"). Thus, the Court is persuaded that WMATA's decision to designate the alarms as "minor" was a decision implicating "potential economic and political [considerations] to the METRO," Smith, 290 F.3d at 209, that was "fraught with public policy concerns," Cope, 45 F.3d at 451. And the discretion exercised by WMATA in this context falls squarely into the "public policy" sphere of decisions that are not subject to liability under the Compact.

### III. Conclusion

For all the above reasons, the Court concludes that Counts IV and XIII as pleaded against WMATA must be dismissed on sovereign immunity grounds.

**SO ORDERED**.

REGGIE B. WALTON
United States District Judge