**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| In the Matter of the | ) |
| **FORT TOTTEN METRORAIL CASES** | ) |
| **Arising Out of the Events of June 22, 2009** | ) |
| | ) |
| | )      **Case No. 10mc314 (RBW)** |
| **LEAD CASE:** <u>Jenkins v. Washington</u> | ) |
| <u>Metropolitan Area Transit Authority, et al.</u> | ) |
| | ) |
| **THIS DOCUMENT RELATES TO:** | ) |
| **ALL CASES** | ) |
| | ) |

_____)

### Memorandum Opinion

This action was initiated on behalf of individuals killed or injured on June 22, 2009, in a

collision between two Washington Metropolitan Area Transit Authority (the "WMATA" or

"Metrorail") trains.  On October 18, 2010, the plaintiffs, except for the Estate of Jeanice

McMillan,[1] who filed a separate amended complaint at the same time, filed their consolidated

Second Amended Master Complaint ("Compl." or "Master Complaint") against the following

defendants: ADCO Circuits Incorporated ("ADCO"); Ansaldo STS USA, Incorporated

("Ansaldo"); Alstom Signaling, Incorporated ("Alstom"); the WMATA; and Arinc Incorporated,

alleging claims for negligence, products liability, and breach of warranty.  One of the defendants,

Alstom, has filed motions to dismiss both the Second Amended Master Complaint and the

Jeanice McMillan Estate Second Amended Complaint and Jury Demand ("McMillan Estate

Compl." or "McMillan Estate Complaint").  Alstom argues that certain counts of the Master

Complaint must be dismissed because they fail to state claims upon which relief may be granted

---

[1]  The representative of the Estate of Jeanice McMillan has filed a separate Second Amended Complaint and Jury
Demand on behalf of Ms. McMillan, the operator of one of the trains, who was killed in the collision.  However, the
counts of each complaint relevant to this motion are nearly identical and so are the facts; therefore, unless otherwise
noted, when the Court references the complaint it will be citing the Second Amended Master Complaint throughout
this opinion.

for the following reasons: (1) Counts 7, 9, 10, and 14 on the ground that they are "time-barred

under the District of Columbia's ten-year statute of repose[,] D.C. Code § 12-310 (2001);" (2)

Counts 11, 12, and 15 on the ground that they "are time-barred under the statute of limitations

[applicable to] breach of warranty claims under the Uniform Commercial Code [(the 'UCC')] as

adopted by the District of Columbia[,] D.C. Code § 28:2-725;" (3) Count 14 on the ground that it

is duplicative of Count 7; (4) Counts 11, 12, and 15 on the ground "that the [Master] Complaint

fails to allege the essential element[s] necessary for a claim [of] breach of warranty;" and (5)

Counts 16 and 17 on the ground that they are "derivative claims" of Counts 7, 9, 10, 11, 12, 14,

and 15.  Defendant Alstom Signaling Inc.'s Motion to Dismiss, April 21, 2010 ("Mot. to

Dismiss") at 1-2.  Alstom argues that those counts of the McMillan Estate Complaint which

correspond with the counts of the Master Complaint should also be dismissed for the reasons just

outlined,[2] and therefore the McMillan Estate Complaint should be dismissed in its entirety "for

failure to state a claim upon which relief can be granted."  Defendant Alstom Signaling Inc.'s

Motion to Dismiss, June 18, 2010 ("McMillan Estate Mot. to Dismiss") at 1.[3]

---

[2]  The Court notes that the McMillan Estate Complaint only alleges one count of negligent train traffic control
(Count 1).  Indeed, Alstom does not argue that any claims in the McMillan Estate Complaint are duplicative.
Therefore, Alstom's arguments regarding the allegedly duplicative claims in the Master Complaint (Counts 7 and
14) do not correspond to any claims in the McMillan Estate Complaint.

[3]  Alstom's motion to dismiss the McMillan Estate Complaint is based merely on "all the reasons set forth in
Alstom's Motion to Dismiss the Master Complaint."  McMillan Estate Mot. to Dismiss at 1-2.  Although many of
the counts in the McMillan Estate Complaint mirror the counts pleaded in the Master Complaint, none of the claims
in the Master Complaint correspond to Count 8 of the McMillan Estate Complaint.  See McMillan Plaintiff's
Response and Opposition to Defendant Alstom's Motion to Dismiss ("McMillan Estate Opp'n") at 2.  This count is
therefore not directly addressed by Alstom's motion to dismiss.  Alstom argues, however, that under the Case
Management Order (the "CMO") "McMillan is precluded from pursuing [any] claims" other than those pleaded in
the Master Complaint, Defendant Alstom Signaling Inc.'s Reply Memorandum in Support of its Motion to Dismiss,
July 16, 2010 ("Alstom's McMillan Estate Reply") at 4, because the CMO states that the Master Complaint "shall be
the operative pleading[]," CMO No. 1 ¶ 32, and, in any event, Count 8 of the McMillan Estate Complaint is not
"substantially different from" Count 10 of the Master Complaint, Alstom's McMillan Estate Reply at 3 (quoting
Minute Order, June 24, 2010).  Because Alstom does not raise these arguments until its reply brief, the Court need
not consider them.  Town of Norwood v. Fed. Energy Regulatory Comm'n, 962 F.2d 20, 25 (D.C. Cir. 1992).  In any
(continued...)

For the reasons that follow, Alstom's motions will be granted in part and denied in part.[4]

## I. Background

The complaints allege that "[o]n Monday, June 22, 2009, [at] about 4:58 p.m., eastern daylight time, . . . Metrorail train 112 collided with the rear end of stopped train 214 near the Fort Totten station in Washington, D.C." Compl. ¶ 156. As a result of the collision, nine passengers and the striking train's operator were killed and more than seventy passengers were injured. Compl. ¶ 161. The accident purportedly occurred because "[t]he Metrorail automatic train control system stopped detecting the presence of train 214 (the . . . train [that was struck]) in track circuit B2-304, which caused train 214 to stop and also allowed speed commands to be transmitted to train 112 (the striking train) until the collision." National Transportation Safety Board, Railroad Accident Report 10/02: Collision of Two Washington Metropolitan Area Transit Authority Metrorail Trains Near Fort Totten Station 120, underline available at http://www.ntsb.gov/publictn/2010/RAR1002.pdf.

_____

[3](...continued)
event, the June 24, 2010 Order permits the McMillan Estate to file separate claims so long as "the plaintiff deems the issues . . . substantially different from those [advanced] in the Master Complaint." Minute Order, June 24, 2010 (emphasis added). Count 10 of the Master Complaint alleges negligent failure to warn primarily based on an alleged duty to advise the plaintiffs of "any deficiencies associated with the subway system," specifically the automatic train control and the automatic warning systems. Compl. ¶¶ 260-67. The gravamen of Count 8 of the McMillan Estate Complaint, on the other hand, is the negligent failure to warn Ms. McMillan of the dangers associated with using both GRS and US&S components in a track circuit. McMillan Estate Compl. ¶¶ 97-111. The McMillan Estate therefore has a basis for believing that Count 8 of its complaint is substantially different from Count 10 of the Master Complaint, and hence the CMO does not preclude the McMillan Estate from pursuing Count 8 of its complaint.

[4] In addition to the Master Complaint, the McMillan Estate Complaint, and Alstom's two motions, the Court considered the following memoranda: (1) Defendant Alstom Signaling Inc.'s Statement of Points and Authorities in Support of its Motion to Dismiss ("Def.'s Mem."); (2) the Memorandum of Points and Authorities in Support of Plaintiffs' Joint Opposition to Defendant Alstom's Motion to Dismiss ("Pls.' Jt. Opp'n"); (3) the McMillan Estate Opp'n; (4) Defendant Alstom Signaling Inc.'s Reply Memorandum in Support of its Motion to Dismiss, June 14, 2010 ("Alstom's Reply"); (5) Alstom's McMillan Estate Reply; and (6) the McMillan Plaintiff's Sur-Reply in Opposition to Defendant Alstom's Motion to Dismiss.

Following the accident, civil actions were filed by injured passengers and representatives of passengers who were killed, and those actions were consolidated by this Court. As a result of the consolidation, the plaintiffs filed a single Master Complaint. CMO ¶¶ 31-32. A representative of Jeanice McMillan, the operator of train 112 who died in the collision, subsequently filed a separate complaint. McMillan Estate Compl. ¶ 1.

As noted earlier, according to the complaints, the trains collided because the WMATA's automatic train control system failed to detect the presence of train 214 on the track. Compl. ¶ 163. Due to the false reading and because train 112 was operating in automatic mode, it did not slow as it approached the track occupied by train 214. Id. ¶¶ 158, 163. The train operator, McMillan, overrode the automatic mode by activating emergency brakes when train 112 was about 300 feet from train 214. Id. ¶ 160. However, despite McMillan's actions, it failed to stop in time to prevent the collision due to the train's speed. Id.[5]

The WMATA's train detection system is comprised of various components, including "transmitters, receivers, and impedance bonds," id. ¶ 165, which, according to the plaintiffs, were manufactured by defendants Alstom, Ansaldo, and ADCO, id. ¶¶ 18, 166. The train detection system was designed in the 1970s, id. ¶ 164, and some of the parts were actually manufactured by General Railway Signal ("GRS"), "the predecessor corporation to [d]efendant Alstom," id. ¶ 166. Around 2004, the WMATA began replacing GRS components with those provided by United Switch & Signal ("US&S"), the predecessor corporation of defendant Ansaldo. Id. ¶ 166. WMATA employees and US&S personnel installed the replacement components, id., and neither complaint contends that Alstom had any role in installing the new

---

[5] The complaints also allege that the alarm system installed by defendant ARINC to identify false readings of train vacancy on the tracks had been improperly disabled. Compl. ¶¶ 191, 217.

components other than making its engineers available for technical discussions and participating in an investigation concerning an earlier event involving the train detection system, id. ¶¶ 166, 173.

The use of both GRS and US&S components allegedly diminished the sensitivity of the train detection system, resulting in the track circuit not de-energizing as it should have to detect the presence of a train on the track.  Id. ¶ 167.  Specifically, one symptom, "bobbing," caused the train detection system for a block of track to indicate the block was vacant, then occupied, and then vacant again.  Id. ¶ 168.  This problem was detected by a WMATA crew installing the replacement components, id., and a work order was opened to correct the bobbing problem, but it was not acted upon before the crash, which occurred five days later, id. ¶ 169.

Both the Master Complaint and the McMillan Estate Complaint raise claims of negligence, products liability, and breach of warranty against defendant Alstom.[6]  Id. ¶¶ 228-241, 250-276, 284-305.  The claims primarily allege that malfunctions in the electronic train control system caused the crash.  Id. ¶ 235.  Alstom, as one of the providers of the components used in the electronic train control system, is alleged to have failed to properly design, manufacture, install, inspect, test, and maintain the automated warning system that should have

---

[6]  These claims asserted in the Master Complaint against Alstom are as follows: Count 7 - negligent train traffic control; Count 9 - strict products liability—design defect, manufacturing defect, failure to warn; Count 10 - negligence—design defect, manufacturing defect, failure to warn; Count 11 - breach of implied warranty of merchantability; Count 12 - breach of express warranty; Count 14 - negligent train traffic control; Count 15 - breach of warranty & implied warranty of fitness for particular purpose; Count 16 - wrongful death; and Count 17 - a survival claim for injuries sustained by the decedents prior to their deaths.

These corresponding claims asserted in the McMillan Estate Complaint against Alstom are as follows: Count 1 - negligent train traffic control; Count 2 - strict products liability—design defect, manufacturing defect, failure to warn; Count 3 - negligence—design defect, manufacturing defect, failure to warn; Count 4 - breach of implied warranty of merchantability; Count 5 - breach of express warranty; Count 6 - breach of warranty & implied warranty of fitness for particular purpose; Count 8 - negligence—failure to warn; Count 9 - wrongful death; and Count 10 - a survival claim for injuries sustained by McMillan prior to her death.

prevented the two trains from colliding.  Id. ¶¶ 240, 253.  The plaintiffs also allege that Alstom

breached implied and express warranties that its products, such as the electronic control system,

were fit for the safe transportation of WMATA employees and fare-paying passengers.  Id. ¶¶

269, 274, 302; McMillan Estate Compl. ¶¶ 76, 81, 86.  Finally, the complaints assert wrongful

death and separate survival claims for the "pre-impact fright, extreme pain and suffering, fear

and anticipation of impending injury and death."  Compl. ¶¶ 306, 308, 310.

For the reasons set forth below, the Court denies the motion to dismiss as to Counts 7, 9,

10, 16, and 17 of the Master Complaint and Counts 1, 2, 3, 8, 9, and 10 of the McMillan Estate

Complaint.  However, the Court grants the motion as to Counts 11, 12, and 15 of the Master

Complaint, and as to Counts 4, 5, and 6 of the McMillan Estate Complaint.  The Court will also

grant the motion to dismiss either Counts 7 or 14 of the Master Complaint, permitting those

plaintiffs to select one of the two counts on which they wish to proceed.

## II.  Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a

complaint has properly stated a claim upon which relief may be granted.  Woodruff v. DiMario,

197 F.R.D. 191, 193 (D.D.C. 2000).  For a complaint to survive a Rule 12(b)(6) motion, Federal

Rule of Civil Procedure 8(a) requires that it contain only "a short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although Rule 8(a)

does not require "detailed factual allegations," a plaintiff is required to provide "more than an

unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, ___ U.S. ___,

___, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests," Twombly, 550 U.S. at 555 (omission in original) (internal quotation marks omitted).  In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, ___ U.S.  at ___, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  A complaint alleging facts which are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 557).

In evaluating a Rule 12(b)(6) motion under this framework, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice," E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  Although the Court must accept the plaintiffs' factual allegations as true, any conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief."  Iqbal, ___ U.S.  at ___, 129 S. Ct. at 1950.  If "the [C]ourt finds that the plaintiff[ has] failed to allege all the material elements of [his or her] cause of action," then the Court may dismiss that claim without prejudice, Taylor v. FDIC, 132 F.3d 753, 761 (D.C. Cir. 1997), or with prejudice, provided that the Court "determines that the

allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency," Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks omitted).

## III. Legal Analysis[7]

A.     Alstom's Statute of Repose Challenge

The District of Columbia statute of repose bars any action for "personal injury" and "wrongful death" "resulting from the defective or unsafe condition of an improvement to real property" if the injury or death occurs more than ten years after the "improvement was substantially completed." D.C. Code § 12-310(a)(1) (2001). An improvement is substantially completed when "it is first used" or "first available for use." Id. § 12-310(a)(2).

According to Alstom, the automatic train detection system is an improvement to real property and therefore the plaintiffs' personal injury and wrongful death claims are covered by the statute of repose.[8] Def.'s Mem. at 15. Alstom argues that because the system "is a dated system whose design goes back to the early 1970s," it was "substantially completed" over thirty years before the June 22, 2009 crash that is the subject of this litigation. Id. at 16. Furthermore, Alstom asserts that the injuries resulting from the crash occurred more than ten years after

_____

[7]  The Court notes that the McMillan Estate opposition incorporates the other plaintiffs' joint opposition to Alstom's motion to dismiss. McMillan Estate Opp'n at 1. The Court also notes that Alstom's motion to dismiss the McMillan Estate Complaint incorporates the statement of points and authorities in support of its motion to dismiss the Master Complaint, McMillan Estate Mot. to Dismiss at 1-2, and Alstom's reply to the McMillan Estate opposition incorporates its memorandum in support of its reply to the other plaintiffs' joint opposition, Alstom's McMillan Estate Reply at 5.

[8]  The plaintiffs do not contest that the automatic train control system is an improvement to real property. Pls.' Jt. Opp'n at 4. Although the McMillan Estate contends that there is a need for further discovery to fully know if the automatic train control system, with its replacement parts, remains an improvement to real property, McMillan Estate Opp'n at 4, the McMillan Estate has "adopt[ed the plaintiffs' joint] memorandum in opposition in its entirety," id. at 1, and the joint opposition concedes that the automatic train control system is an improvement to real property, Pls.' Jt. Opp'n at 4. The McMillan Estate is therefore bound by the other plaintiffs' acknowledgment.

installation of the train detection system was first completed.  Id.  For these reasons Alstom argues that the plaintiffs' personal injury claims are barred by the statute of repose.[9]  Id. at 17.

The plaintiffs argue in response that the statute of repose is not available to Alstom.  Pls.' Jt. Opp'n at 4.  They refer the Court to section 310(b)(3) of the statute, which excludes from its coverage "any manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property."  Id. (citing D.C. Code § 12-310(b)(3)).  And according to the plaintiffs, "Alstom, via its predecessor corporation, GRS, manufactured and supplied the original defective signaling equipment" and "[t]he statute of repose therefore does not immunize [d]efendant Alstom."  Id.

Alstom argues that the reach of section 310(b)(3) is limited.  First, it argues that if a defendant is both a manufacturer and a designer of an allegedly defective product section 310(b)(3) does not apply to those aspects of the defect related to design.  Def.'s Mem. at 11-12 & n.2; Alstom's Reply at 2 ("Alstom cannot be sued for negligent design alone, and Counts Seven, Nine, Ten, and Fourteen of the [Master] Complaint must be dismissed to the extent that they accuse Alstom of . . . fault in its role as a designer."); see also id. at 6.  Alstom also argues that because section 310(b)(3) was added as an amendment in 1987, many years after the train detection system had been installed, the manufacturer exclusion should not be applied retroactively to it, Def.'s Mem. at 11 n.2, as doing so "would violate due process by divesting Alstom of its substantive right not to be sued by reviving time-barred claims," Alstom's Reply at 2-3.  Specifically, Alstom states that its predecessor "designed, manufactured, and installed the automatic train control system, including its component parts, in the 1970s," Def.'s Mem. at 11

---

[9]  Alstom limited its statute of repose defense to the plaintiffs' tort claims because the statute does not apply to "any action based on a contract."  D.C. Code § 12-310(b)(1).

n.2, and "[a]s such, any and all potential claims against Alstom for its work on the Metro

contract expired as of 1985, before the Amendment Act became law," Alstom's Reply at 4.

Alstom posits that it justifiably relied upon the prior version of the statute of repose that

accorded immunity from liability, even to manufacturers, id. at 5-7, 10-12, and argues that

retroactive application would be "inherently unfair," id. at 7. Alstom further asserts that if it is

held subject to the 1987 amendment, it would be divested of a "substantive right not to be sued."

Id. at 3. Finally, Alstom argues that an examination of the legislative intent of the scope of the

1987 amendment suggests that the amendment should only be made applicable to asbestos

manufacturers, as opposed to all manufacturers in general. Id. at 8.

1.      The Applicability of Section 310(b)(3) of the Statute of Repose to Manufacturers
        and Suppliers Facing Claims of Negligent or Faulty Design

Alstom argues that because in effect it wears two hats, that of a designer and that of a

"producer" of equipment, and because the statute of repose protects design professionals from

being sued, the Court should dismiss at least those claims lodged against it related to defective

design. Alstom's Reply at 1-2. Furthermore, in its reply brief Alstom directs the Court's

attention to the plaintiffs' opposition brief as proof that "there is no dispute amongst the parties

that the Amendment Act did not affect the statute of repose's protect[ion] [of] design

professionals." Alstom's Reply at 5-6 (alterations in original) (internal quotation marks omitted)

(quoting 325-343 E. 56th Street Corp. v. Mobil Oil Corp., 906 F. Supp. 669, 674 (D.D.C. 1995));

see also id. at 10 n.5; id., Ex. B at 3 (stating that the change in the law should only apply to

manufacturers and suppliers who are not "involved with the actual design of the improvement,"

and that the statute is intended to "cut off actions for design defects"); McMillan Estate Opp'n,

Ex. A (reproduction of District of Columbia Statute of Limitations Act of 1986, D.C. Law 6-202

(Jan. 8, 1987)) (amending section 12-310 only "[b]y striking the period after the last word of the section and inserting in its place, 'or (3) any manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property, or (4) any action brought by the District of Columbia government'").

While the plaintiffs do concede that design professionals are protected under both the original 1972 version of the statute and the amended statute, they attempt to limit their concession by claiming that Alstom's roles as designer and manufacturer cannot be separated for the purpose of the statute of repose. See Pls.' Jt. Opp'n at 4 (stating that "the designer of a defective or unsafe condition of an improvement to real property is protected from liability by a ten-year statute of repose. If the plaintiff's injury occurs ten years and one day after the improvement is complete, she cannot recover against even the most reckless designer" (internal quotation marks and citation omitted)); id. at 6 (stating that "[s]ection (b)(3) narrowed the statute of repose to make it clear that D.C.'s stream of commerce analysis applied in force and exempted only the designer . . ." (emphasis in original) (internal quotation marks omitted)); see also id. at 5 (stating that while Alstom "seeks to distinguish its design role from its manufacture role[, t]he statute makes no such distinction"). They allege that because Alstom is a manufacturer, excluded from protection under the statute of repose, its activities as both a designer and manufacturer must be excluded from protection.[10] Id. The plaintiffs would have

_____

[10]  In an attempt to persuade the Court of the correctness of their position, the plaintiffs explain that:

> [i]f [d]efendant Alstom had merely manufactured a product defectively designed by another party, and the [p]laintiffs obtained judgment against [d]efendant Alstom, it would obtain a right of indemnity against the designer. But [because] the statute of repose would immediately extinguish that right against the designer because more than ten years has elapsed . . . [,] Alstom would still be liable for the entire amount.

(continued...)

the Court disregard the plain language of the statute by permitting a designer of a product to be sued after the statutory limitation has expired because the designer was also a manufacturer of the product. See D.C. Code § 12-310 (stating that the ten year statute of repose is applicable to everyone, except manufacturers and suppliers of equipment or machinery, sued for injuries resulting from "the defective or unsafe condition of an improvement to real property"). The plaintiffs, in effect, seek an end run around the statute of repose. Because the plaintiffs' argument is untenable, and they have conceded that design professionals are protected under both the original 1972 version of the statute and the amended statute, see Pls.' Jt. Opp'n at 4, 6, the Court finds that the plaintiffs' claims against Alstom in its capacity as a designer must be dismissed.[11]

2.      The Retroactivity of the 1987 Amendment to D.C. Code Section 12-310, Which Added Section 310(b)(3)

---

(...continued)
Pls.' Jt. Opp'n at 5. This example fails to take into account the differences between the manufacturing defect and design defect claims. A product may have a defective design without being defectively manufactured, and vice versa. Therefore, dismissing the design defect claims against Alstom would limit its liability to manufacturing defects only.

[11]  Both the plaintiffs and the defendant make arguments that claims against a defendant as both manufacturer and designer are not severable under the statute of repose. However, the Court disagrees. In its motion to dismiss, Alstom argues that as a manufacturer and designer it is completely protected under the statute of repose for design and manufacturing defects. Def.'s Mem. at 11 & n. 2. Indeed, Alstom refers the Court to a case from the United States District Court for the Western District of Virginia which examined the Virginia statute of repose, a statute similar to the District of Columbia statute. See id. (citing Jordan v. Sandwell, Inc., 189 F. Supp. 2d 406 (W.D. Va. 2002)). However, the Court notes that in that case the Virginia Court held that there was no need to address the severability of claims for manufacturing and design defects, as the defendant had only been sued in his capacity as a designer. Jordan, 189 F. Supp 2d at 412. Furthermore, the Court intimated that the claims would have been severable and any manufacturing claims would not have necessarily been barred. See id. at 414. This Court agrees that such a result is correct.

Alstom contends that "[retroactive] changes are inherently unfair as they rewrite the rules of society without notice and without any opportunity for affected persons to comply. Indeed, [they] can potentially act to divest parties of their vested rights." Alstom's Reply at 7. Alstom therefore argues that section 310(b)(3), which was enacted in 1987, should not be applied retroactively. Id. at 12. Moreover, Alstom states that "[a]mendments to statutes should generally not be applied retroactively unless the language of the statute and the intent behind it demand that outcome." Id. at 8 (citing Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 837-38 (1990)). And, Alstom posits that "[i]n this case, . . . [the p]laintiffs cannot meet their substantial burden of showing that clear intent which is required to make the Amendment Act applicable to Alstom." Id. The plaintiffs disagree, arguing that "th[e Amendment] enacted in 1986 [sic], [does] appl[y] retroactively." Pls.' Jt. Opp'n at 4.

The District of Columbia's statute of repose was first enacted in 1972 and applied to manufacturers. See Pub. L. No. 92-579, 86 Stat. 1275 (1972) (enacting statute of repose); Alstom's Reply at 6. Manufacturers were exempted from the statute of repose by subsection (b)(3), which was enacted through the adoption of D.C. Law 6-202. McMillan Estate Opp'n, Ex. A (reproduction of D.C. Law 6-202). This amendment came into effect on February 28, 1987 and applied to "actions filed in a court after July 1, 1986." Id.

The District of Columbia Circuit held in Wesley Theological Seminary of the United Methodist Church v. United States Gypsum Co., 876 F.2d 119, 122-23 (D.C. Cir. 1989), that the retroactive application of this amendment did not violate due process. In Wesley, the defendant allegedly manufactured and sold defective asbestos tiles in 1957. Id. at 120. Prior to the amendment, the defendant in Wesley would have been immune from suit; however, the 1987

amendment revived the plaintiff's claim by excluding manufacturers from the protection of the statute.  Id. at 120-21.  Deciding that the retroactive application of the 1987 amendment did not violate the defendant's rights under the Due Process Clause of the Fifth Amendment, the District of Columbia Circuit surmised that the Supreme Court had assessed the retroactivity question on the basis of "rationality."  Id. at 122 (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15-16 (1976) (stating that  "legislative [a]cts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality," and it is the defendant's burden to demonstrate a due process violation by showing that "the legislature has acted in an arbitrary and irrational way," because the case law is "clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.  This is true even though the effect of the legislation is to impose a new duty or liability based on past acts" (internal citations omitted))).  Applying this rationality standard, the court determined that it was not irrational for the legislature to decide that losses stemming from defects "discovered long after installation should fall on the supplier."  Id.

Similar to claims that had been raised by the plaintiff in Wesley, the plaintiffs' claims in this case would be untimely filed under the 1972 version of the statute of repose.  However, just as the District of Columbia Circuit in Wesley found no due process proscription against retroactively applying the 1987 amendment to revive 1957 claims, this Court similarly finds that retroactively reviving the claims in this case does not offend due process either.  Specifically, the Court can find no justification for why the same "rational legislative purpose" for the statute that warranted giving it "strong deference" in Wesley, id., namely, requiring the supplier to bear the loss for latent defects, id., should not also apply to Alstom's products, whose alleged defects

may have been discovered as late as 2004, long after they were distributed to the public, Compl. ¶¶ 9, 166.

Alstom attempts to avoid the application of <u>Wesley</u> by arguing that the Circuit "did not consider the Supreme Court's holding the year before in <u>Bowen[ v. Georgetown University Hospital,</u>] nor did it have the benefit of the Court's subsequent decisions in <u>Kaiser[ Aluminum & Chemical Corp. v. Bonjorno</u>] or <u>Landgraf[ v. USI Film Products</u>]." Alstom's Reply at 11. The Court is not persuaded by these arguments.

The Supreme Court decisions cited by Alstom concern general presumptions in statutory interpretation and do not directly apply here because the statutory language is clear. Although the Court in <u>Bowen</u> relied on the general principle that "[r]etroactivity is not favored in the law" in rendering its decision, it further stated that retroactive application of legislation is permitted if there is an "express statutory grant" to do so. <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 208 (1988) (assessing whether the Medicare Act expressly granted power to make retroactive rules). Similarly, while <u>Landgraf</u> acknowledged the <u>presumption</u> against the retroactive application of statutes, the Supreme Court also acknowledged that this presumption will not prevail if "Congress first makes its intention clear." <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 267, 280 (1994) (assessing whether the Civil Rights Act of 1991 applied retroactively). Furthermore, when the Supreme Court in <u>Kaiser</u> held that an amendment to a post-judgment interest statute did not retroactively apply to a judgment entered before the enactment, it did so based on the "plain language" of the statute, which "evidence[d] clear congressional intent" against retroactivity. <u>Kaiser Aluminum & Chem. Corp. v. Bonjorno</u>, 494 U.S. 827, 838 (1990).

The plain language of the District of Columbia's statute of repose is equally clear. In adopting the 1987 amendment, the legislature stated that "[t]his act shall apply to actions pending in a court on July 1, 1986, <u>and to actions filed in a court after July 1, 1986</u>." McMillan Estate Opp'n, Ex. A (emphasis added) (D.C. Law 6-202). Because the lawsuits here were filed in 2009, <u>see</u> Compl. ¶ 25, they clearly fall within the intended scope of the amendment.

Alstom also seeks to distinguish its manufacturing activity, which occurred after the statute of repose was enacted in 1972, from the defendant's activity in <u>Wesley</u>, which occurred before the 1972 enactment. Alstom's Reply at 11.[12] Alstom argues that this distinction makes its reliance on the 1972 version of the statute, which did protect manufacturers, and therefore its "equitable arguments against retroactive application . . . far stronger than the" defendant's arguments in <u>Wesley</u>. <u>Id.</u> Although Alstom's argument may have some merit, the Supreme Court has stated that "reliance alone is insufficient to establish a constitutional violation." <u>United States v. Carlton</u>, 512 U.S. 26, 33 (1994) (rejecting a due process challenge against the retroactive application of an amendment to the Tax Code where the challenger had relied on the pre-amendment version, in part, because the Tax Code creates "no vested right" in taxpayers). Therefore, this Court finds, similar to the reasoning in <u>Carlton</u>, that any alleged detrimental reliance by Alstom does not by itself create a due process violation. Although Alstom contends that it had a vested right not to be subject to suit created by the original version of the statute when the 1987 amendment was enacted, Alstom's Reply at 11, this Circuit in <u>Wesley</u> rejected the same argument in construing the same statute—that the 1987 amendment divested defendants of a substantive right not to be sued, 876 F.2d at 121. Finding no reason to conclude

---

[12] The court in <u>Wesley</u> briefly considered the "equities" of the case, finding that the lack of reliance by the defendant on a statute of repose—which "became law only in 1972, about 12 years after the last building was completed," 876 F.2d at 122 (internal citation omitted),—was "not especially powerful," <u>id.</u>

that <u>Wesley</u> is not controlling, this Court is compelled to enforce the 1987 amendment retroactively.

3. The Scope of Section 310(b)(3)

Alstom further claims that the legislature intended the 1987 amendment to reach only "producers of hazardous materials, in particular asbestos." Alstom's Reply at 6. The language of the statute, however, makes no such distinction between asbestos producers and producers in general. <u>See</u> D.C. Code § 12-310(b)(3) (making the statute of repose inapplicable to "<u>any</u> manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property" (emphasis added)). A plain reading of the statute, therefore, excludes from its coverage all producers of equipment or machinery installed on real property. <u>See</u> <u>United States v. Villanueva-Sotelo</u>, 515 F.3d 1234, 1237 (D.C. Cir. 2008) ("We must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. If it does, our inquiry ends and we apply the statute's plain language. But if we find the statutory language ambiguous, we look beyond the text for other indicia of congressional intent." (internal citations and quotation marks omitted)); <u>see also</u> <u>McCormick v. Columbus Conveyor Co.</u>, 564 A.2d 907, 910 (Pa. 1989) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive.").

Furthermore, the Court notes that not all statute of repose cases decided before the 1987 amendment involved hazardous materials. <u>See, e.g.</u>, <u>J.H. Westerman Co. v. Fireman's Fund Ins. Co.</u>, 499 A.2d 116, 117 (D.C. 1985) (producers of electrical switches); <u>Britt v. Schindler Elevator Corp.</u>, 637 F. Supp. 734, 735 (D.D.C. 1986) (manufacturer of elevators). Thus, if the District of Columbia legislature intended for section 310(b)(3) to reach only asbestos

manufacturers, given the litigation that had already taken place, it could have used more

restrictive language other than use of the term "any manufacturer." Importantly, one of Alstom's

own exhibits supports the reasonableness of this conclusion by indicating that the 1987

amendment was enacted to achieve a separate intent, i.e., "[s]ection 4 of the draft bill would

bring the District's law in line with those of [the] overwhelming majority of states," Alstom's

Reply, Ex. A at 3, an intent distinguishable from concerns about the overwhelming amount of

asbestos litigation taking place at the time. Therefore, Alstom's own evidence suggests that

while some provisions of D.C. Law 6-202 were intended to apply solely to asbestos litigation,

such as the addition of subsection (10) to section 12-301, see D.C. Law 6-202 § 3,[13] and the

addition of section 12-311, see D.C. Law 6-202 §§ 2, 5,[14] other provisions, such as the addition

---

[13] D.C. Law 6-202 § 3 states, in relevant part, that:

>  Section 12-301 of the District of Columbia Code is amended:
>  (a) By adding a new subsection (10) to read as follows:
>       "(10) for the recovery of damages for an injury to real property from
>  toxic substances including products containing asbestos – 5 years from the date
>  the injury is discovered or with reasonable diligence should have been
>  discovered."

D.C. Law 6-202 § 3(a) (emphasis added).

[14] D.C. Law 6-202 § 2 states that:

>  (a) The table of contents for title 12 is amended to read as follows:
>  "3. Limitation of Actions. . . . . Sections 12-301 to 12-311.".
>  (b) The table of contents for Chapter 3 of title 12 is amended by adding the
>  following after the heading for section 12-310:
>  "12-311. Actions arising out of death or injury caused by exposure to asbestos.".

D.C. Law 6-202 § 2 (emphasis added).

Section 5 states that:

>  Title 12, Chapter 3 of the District of Columbia Code is amended by adding a new
>  section 12-311, to read as follows:
>  "Sec. 12-311. Actions arising out of death or injury caused by exposure to
>  asbestos.
>  "(a) In any civil action for injury or illness based upon exposure to asbestos, the

(continued...)

18

of subsections (3) and (4) to section 12-310, did not specifically relate to asbestos litigation, <u>see</u> D.C. Law 6-202 § 4.[15]

    For all of these reasons, this Court finds that the District of Columbia statute of repose is not available as a defense to Alstom resulting from its role as a manufacturer and denies Alstom's motion to dismiss Counts 7,[16] 9, 10, and 14 of the Master Complaint and Counts 1, 2, 3, and 8[17] of the McMillan Estate Complaint. Furthermore, because Alstom is not entitled to the

---

[14](...continued)
> time for the commencement of the action shall be the later of the following:
> > "(1) Within one year after the date the plaintiff first suffered disability; or
> > "(2) Within one year after the date the plaintiff either knew, or through the exercise of reasonable diligence should have known, that the disability was cause [sic] or contributed to by the exposure.
> "(b) "Disability" as used in subsection (a) of this section means the loss of time from work as a result of the exposure that precludes the performance of the employee's regular occupation.
> "(c) In an action for the wrongful death of any plaintiff's decedent, based upon exposure to <u>asbestos</u>, the time for commencement of an action shall be the latter of the following:
> > "(1) Within one year from the date of the death of the plaintiff's decedent; or
> > "(2) Within one year from the date the plaintiff first knew, or through the exercise of reasonable diligence should have known, that the death was caused or contributed to by the exposure.".

D.C. Law 6-202 § 5 (emphasis added).

[15]  Section 4 makes no reference to asbestos, stating that:

> Section 12-310 of the District of Columbia Code is amended:
> (a) By striking the period after the last word of the section and inserting in its place ", or (3) any manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property, or (4) any action brought by the District of Columbia government.".

D.C. Law 6-202 § 4.

[16]  The Court agrees with Alstom that Count 7 and Count 14 of the Master Complaint are duplicative of one another, <u>see</u> <u>infra</u> Part III.C.1.; therefore, the plaintiffs must inform the Court as to which of the two counts they desire to prosecute.

[17]  While Alstom did not directly address Count 8 of the McMillan Estate Complaint in pursuit of its statute of repose arguments, <u>see</u> <u>supra</u> note 3; Def.'s Mem. at 8 ("Counts seven, nine, ten and fourteen should be dismissed as time-barred under the statute of repose." (all capitals in original)), Alstom clearly indicated that the statute of repose applied to the plaintiffs' negligence and strict liability claims, Defs.' Mem. at 8 ("Plaintiffs' claims against Alstom for negligence and strict liability should be dismissed as time-barred under D.C.'s statute of repose."). Because

(continued...)

protection accorded by the statute of repose in its capacity as a manufacturer, the Court need not address the plaintiffs' position that the WMATA's replacement of Alstom's GRS components reset the ten-year repose period.

B.    The Plaintiffs' Breach of Warranty Claims

Alstom also seeks dismissal of the plaintiffs' breach of warranty claims (Counts 11, 12, and 15 of the Master Complaint and Counts 4, 5, and 6 of the McMillan Estate Complaint) on the grounds that they are insufficiently pleaded and time-barred under the UCC's statute of limitations. According to Alstom, the plaintiffs have not adequately alleged a claim for breach of the implied warranties of merchantability and fitness for a particular purpose because they allegedly neglected to state that Alstom is a "merchant" or "seller" of "component parts for train detection systems," Def.'s Mem. at 17, or that the sale was not an isolated sale of goods, id. at 21. Alstom also contends that the non-merchant exception for the warranty of fitness does not apply because the plaintiffs did not plead that the "particular circumstances of [this] case justify the fact that Alstom is a non[-]merchant." Id. at 21. In addition, Alstom maintains that the express and implied warranty claims are time-barred under the UCC's statute of limitations. Id. at 17-20. Specifically, Alstom contends that (1) the component parts of the transit system were delivered in the 1970s, (2) the plaintiffs do not allege that the express warranty extended to future performance such that the discovery rule would apply to those claims, and (3) based on Hunt v. DePuy Orthopaedics, Inc., 636 F. Supp. 2d 23, 26 (D.D.C. 2009), and Lee v. Wolfson, 265 F. Supp. 2d 14, 19-20 (D.D.C. 2003), the discovery rule does not apply to implied

---

[17](...continued)
Count 8 of the McMillan Estate Complaint asserts a negligence claim, Alstom's statute of repose arguments encompass this count, which is not precluded under the statute since the Court has determined that Alstom was not protected by the statute in its role as a manufacturer.

warranties. Def.'s Mem. at 20. Thus, Alstom alleges that the breach of warranty claims accrued at the time of delivery, and are barred by the four-year statute of limitations of UCC section 28:2-725. Id.

The plaintiffs respond, arguing that the breach of warranty claims are not based on a contract of sale, and are therefore not subject to the UCC statute of limitations. The plaintiffs refer the Court to Bowler v. Stewart-Warner Corp., 563 A.2d 344 (D.C. 1989), for the proposition that consumers' claims for breach of the implied warranties are "not subject to the various rules governing [UCC] sales" because "the warranty in a products liability case brought by a consumer [is] quite different from a warranty in connection with a sale of goods." Pls.' Jt. Opp'n at 7 (internal quotation marks omitted) (quoting Bowler, 563 A.2d at 346). Specifically, the plaintiffs allege that consumer-injury claims based on products liability are governed by rules applicable to strict liability, including a discovery rule with a three-year statute of limitations. Id. at 8-9. In addition, the plaintiffs argue that Bowler is irreconcilable with Hunt and Lee, "and as a result they directly contradict Bowler, which this Court must follow as a definitive statement of D.C. law;" therefore, according to the plaintiffs, Lee and Hunt are invalid. Id. at 9-10. Moreover, the plaintiffs contend that even if Lee and Hunt are not nullified by Bowler, they are distinguishable. Id. at 10 (stating that Hunt and Lee are distinguishable because each plaintiff in those cases was "a party to the sale," which brought each "transaction under the [UCC]" as a "classic [UCC] 'sale of goods'").[18] Finally, the plaintiffs request that the Court defer ruling on Alstom's motion to dismiss the express warranty claims until the plaintiffs have had an opportunity to conduct discovery regarding any potential express warranties of future

---

[18] The plaintiffs assert that the present case is different because "the 'sale of goods' was between [d]efendant Alstom and [d]efendant WMATA." Pls.' Jt. Opp'n at 10.

performance made by Alstom or its predecessor, and "any further warranties to [d]efendant WMATA" when Alstom met with WMATA "in October 2006 regarding the ongoing signaling overhaul," as claims stemming from that event "would not necessarily be barred by the four-year statute of limitations." Id. at 11.

In addition to these arguments, the McMillan Estate further argues that its complaint sufficiently alleges that Alstom is a "seller" or "merchant."[19] McMillan Estate Opp'n at 13-15. The McMillan Estate directs the Court to allegations that Alstom "provided train traffic control equipment, software, and support services to [the] WMATA," and that Alstom "was involved in the design, manufacture, marketing, inspection, distribution, sale, and/or warranty to the public, including the WMATA subway system . . . and placed into the stream of commerce, the automatic train control system, or component parts thereof, for the WMATA system." Id. at 14 (quoting McMillan Estate Compl. ¶¶ 4-5). The McMillan Estate argues that these allegations are sufficient to establish that Alstom is "one who sells or contracts to sell goods" under D.C. Code section 28:2-103 (2001) (definition of seller) and as "one who deals in goods of the kind or otherwise, by its occupation, holds itself out as having knowledge or skill peculiar to the practices or goods involved" under D.C. Code section 28:2-104 (2001) (definition of merchant). Id. at 14. In addition, the McMillan Estate contends that there is no indication that a plaintiff has an "affirmative obligation to plead that the [alleged merchant] . . . was not engaged in an isolated sale of goods." Id. at 15. The McMillan Estate also alleges that "Alstom/GRS expressly guaranteed the future performance of its automatic train control system and components" in its

---

[19] The plaintiffs' joint opposition does not respond to the argument that they failed to allege that Alstom is a merchant or seller.

contract with the WMATA,[20] and therefore the four-year statute of limitations was tolled until the breach was discovered on the day of the incident. Id. at 16-17. Finally, the McMillan Estate argues that the discovery rule may apply to implied warranty claims because, although the District of Columbia has held that implied warranties themselves cannot guarantee future performance, the District has not addressed "the more limited issue of whether an implied warranty claim may accrue under a discovery rule when there is also a separate and express guarantee of future performance." Id. at 17.

In its reply to the joint opposition, Alstom states that "[w]hether precluded by the statute of limitations, or simply duplicative of the strict liability claim, the implied warranty counts must be dismissed." Alstom's Reply at 3. Specifically, Alstom notes that the plaintiffs pleaded breach of warranty under the UCC in their complaints, but their opposition "abandoned these [UCC] claims." Id. Alstom alleges that in having done so, the "[p]laintiffs concede that their breach of implied warranty claims are subsumed by, and co-extensive with, their strict products liability claim (Count [9])." Id. Furthermore, Alstom contends that Bowler is inapplicable because it deals only with the issue of which instruction on liability should be given to a jury – strict liability, warranty, or both – where a defective product gave rise to claims for both breach of the implied warranty of merchantability and strict liability, whereas it "says nothing about what the statute of limitations is for a 'tortious' breach of implied warranty claim." Id. at 14. Alstom also argues that a ruling on the express warranty claim should not be deferred until after

---

[20] These purported guarantees include promises that "[a]ny amplifier breaking into spurious oscillations shall not result in an unsafe condition," McMillan Estate Opp'n at 16 (quoting Ex. E (Contract)), that the system and its components "shall not cause unsafe conditions, even if added to other failures," id. (quoting Ex. E (Contract)), and that "its automatic train control system and components would be fail-safe," id., because "[s]elf-detecting components or system failures will cause the train(s) to stop or run at a safe, more restrictive speed than that permitted with no failure," id. (quoting Ex. E (Contract)).

the plaintiffs are given an opportunity to conduct discovery because, while "discovery might reveal an express warranty of future performance made by Alstom[,] . . . [the p]laintiffs have not alleged a breach of an express warranty of future performance in their [c]omplaint." Id. at 3 (emphasis in original).

Alstom also replies to the McMillan Estate's opposition, arguing that, in addition to its foregoing arguments made in response to the joint opposition, the future performance exception does not apply to the express warranty claim because the Court cannot consider the GRS/Alstom contract since it was not referenced in or attached to the complaints, Alstom's McMillan Estate Reply at 6-7, and because "naked contract specifications cannot . . . be bootstrapped into unlimited express warranties of lifetime performance," id. at 7. In addition, Alstom contends that the McMillan Estate's supposition that an implied warranty claim may "accrue under a discovery rule when there is also a separate and express guarantee of future performance" is not supported by any legal authority, id. at 7 (internal quotation marks omitted) (quoting McMillan Estate Opp'n at 17), and in any event the claim fails because the McMillan Estate did not allege in its complaint an express warranty of future performance, id. at 8.

    1.    <u>Do the Complaints Allege that Alstom is a "Merchant" or "Seller" under the UCC?</u>

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As such, "a pleader must allege facts, directly or <u>indirectly</u>, supporting each element of [a] claim." <u>McDonald Bros., Inc. v. Tinder Wholesale, LLC</u>, 395 F. Supp. 2d 255, 265 (M.D.N.C. 2005) (emphasis added); <u>see also</u> <u>Guthery v. United States</u>, 562 F. Supp. 2d 136, 138-

39 (D.D.C. 2008). Accordingly, courts are permitted to draw reasonable inferences from the pleadings when ruling on a Rule 12(b)(6) motion. <u>Guthery</u>, 562 F. Supp. 2d at 138-39.

Under District of Columbia law, "a warranty that . . . goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." D.C. Code § 28:2-314(1) (2001). A claim in a complaint based on a breach of implied warranty of merchantability theory must therefore contain facts plausibly showing that the defendant is a merchant. <u>See</u> D.C. Code § 28:2-314 cmt. 13 (stating that in order to allege a claim for breach of warranty, the plaintiff must prove the existence of the warranty); D.C. Code § 28:2-314(1) (stating that the warranty of merchantability is implied in a contract for the sale of goods "if the seller is a merchant").[21] A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." D.C. Code § 28:2-104(1). Thus, "[a] person making an isolated sale of goods is not a 'merchant' within the meaning of the full scope of [section 28:2-314]." D.C. Code § 28:2-314 cmt. 3; <u>see also</u> <u>Rock Creek Ginger Ale Co., Inc. v. Thermice Corp.</u>, 352 F. Supp. 522, 527-28 (D.D.C. 1971) (applying the limitation of comment 3 to D.C. Code section 28:2-314, and holding that a beer manufacturer who sold surplus carbon dioxide to a distributor of carbon dioxide was not a merchant of carbon dioxide, and therefore not subject to implied warranties of merchantability, because it was an isolated sale).

Here, the complaints allege that Alstom "provides train traffic control equipment, software and support services to [the WMATA]," Compl. ¶ 7, and that "at all relevant times . . .

---

[21] The complaint must also allege that the product was defective, and that the defect caused an injury. <u>See</u> D.C. Code § 28:2-314 cmt. 13 (stating that in order to allege a claim for breach of warranty, the plaintiff must demonstrate the existence of the warranty, the breach of the warranty, and that the breach was the proximate cause of the injuries sustained). The defendants do not contend that the complaints fail to allege either of these two additional elements of a breach of the implied warranty of merchantability claim.

[Alstom] provided train traffic control equipment, software and support services to [the WMATA]," id. ¶ 8.  Based on these allegations alone, the Court can infer that Alstom "deals in goods of the kind," D.C. Code § 28:2-104(1), specifically train traffic control equipment and software, "or otherwise . . . holds [itself] out as having knowledge or skill peculiar to," id., train traffic control equipment and software.  The plaintiffs need not directly plead that Alstom is a merchant, so long as such status can be implied from the allegations in the complaints and the relationship between the parties.  See Gregory Wood Prods., Inc. v. Advanced Sawmill Machinery Equip., Inc., No. 5:06-CV-00087, 2007 WL 1825179, at *5 (W.D.N.C. June 25, 2007) (finding that the plaintiff had pleaded facts supporting a claim for breach of the implied warranty of merchantability even though the plaintiff never directly alleged that the defendant was a merchant in goods of the kind, because it could be implied from the relationship between the parties and allegations in the complaint).  Nor do the plaintiffs have an affirmative obligation to plead that Alstom was not engaged in an isolated sale of goods, where the allegations in the complaints imply that Alstom was involved in the sale of train traffic control equipment and software over a period of time.  See id.; Compl. ¶¶ 7-8.  Thus, the plaintiffs have sufficiently alleged that Alstom is a merchant for implied warranty of merchantability purposes.

Additionally, in the District of Columbia, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." D.C. Code § 28:2-315 (2001).  A "seller" is defined as "a person who sells or contracts to sell goods."  D.C. Code § 28:2-103(1)(d). Therefore, for a complaint to assert a breach of implied warranty of fitness for particular purpose

claim, it must contain facts plausibly showing that the defendant is a "person who sells or contracts to sell goods." <u>See</u> <u>id.</u>[22]

The complaints allege that Alstom "provided train traffic control equipment, software and support services to [the WMATA]," Compl. ¶ 8, and that Alstom "was involved in the design, manufacture, marketing, inspection, distribution, <u>sale</u>, and/or warranty to the public, including the WMATA subway system and the passengers using that subway system, and placed into the stream of commerce, the automatic train control system, or component parts thereof, for the WMATA system," <u>id.</u> ¶ 9 (emphasis added). Again, these allegations imply that Alstom "sells or contracts to sell goods" – the automatic train control system or its component parts in particular. As noted earlier, the plaintiffs do not have to directly plead that Alstom is a "seller" where it can be inferred from the allegations in the complaints that Alstom had that status. <u>See, e.g.,</u> <u>Gregory Wood Prods., Inc.</u>, 2007 WL 1825179, at *5 (implied warranty sufficiently pleaded despite failure to <u>directly</u> allege that the defendant was a merchant in goods of the kind, because it could be implied from the relationship between the parties and allegations in the complaint); <u>see also</u> <u>Guthery</u>, 562 F. Supp. 2d at 139. Thus, the plaintiffs have sufficiently alleged that Alstom was a seller of the WMATA automatic train control system or its component parts.[23]

> 2.  <u>Are the Breach of Implied Warranty Claims Duplicative of the Strict Products Liability Claim?</u>

---

[22]  The complaint must also allege that the defendant knew or had reason to know of the purpose for which the product was being sold, and that the buyer was relying on the seller's expertise. <u>Quality Air Servs., LLC v. Milwaukee Valve Co., Inc.</u>, 671 F. Supp. 2d 36, 43 (D.D.C. 2009) ("A seller's knowledge of a buyer's particular purpose and its reliance on the expertise of the seller is a necessary element of an implied warranty of fitness for a particular purpose.").

[23]  Because the Court finds that the plaintiffs have sufficiently alleged that Alstom is a seller and merchant, there was no need for the plaintiffs to allege that the particular circumstances of this case warrant the existence of the warranty even if Alstom was a non-merchant. <u>See</u> Def.'s Mem. at 21.

The UCC has a four-year statute of limitations for the filing of breach of warranty claims. See U.C.C. § 2-725; D.C. Code § 28:2-725 (2001). The statute of limitations begins to run at the time of breach,

> regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

D.C. Code § 28:2-725(2). Alstom argues that the discovery rule exception enumerated in this provision does not apply to implied warranties. Def.'s Mem. at 18-20. The plaintiffs, however, contend that their breach of warranty claims are grounded in tort, not on a contract of sale, and are therefore not subject to the UCC, see Pls.' Jt. Opp'n at 7-10, but even if they were subject to the UCC, the discovery rule tolls the statute of limitations as to strict liability claims, and implied warranty product liability and strict liability claims "are one and the same," id. at 8-9.

The plaintiffs are correct that claims of strict products liability and breach of implied warranty are considered a single tort in the District of Columbia. See, e.g., Wainwright v. Washington Metro. Area Transit Auth., 903 F. Supp. 133, 140 (D.D.C. 1995) ("Breach of implied warranty and strict liability in tort are expressions of a single basic public policy as to liability for defective products."); Bowler, 563 A.2d at 347 (granting new trial where the trial judge instructed the jury in both strict liability and implied warranty of merchantability because the two claims represent one tort); Payne v. Soft Sheen Prods., Inc., 486 A.2d 712, 720 (D.C. 1985) ("[W]here [there are] no issues unique to warranty, . . . a claim of strict liability in tort [is] effectively made out [in a] complaint for breach of warranty."). Furthermore, this rule applies only in cases, such as this case, where a third party is bringing an action against a manufacturer

of a product, and thus, privity of contract is absent. Liberty Mut. Ins. Co. v. Equip. Corp. of Am., 646 F. Supp. 2d 51, 56 (D.D.C. 2009) (stating that because the plaintiff and manufacturer were not in privity of contract, the implied warranty and strict products liability claims were construed as a single tort); cf., e.g., Potomac Plaza Terraces, Inc. v. QSC Prods., Inc., 868 F. Supp. 346, 350-52, 354 (D.D.C. 1994) (permitting both breach of implied warranty and strict products liability claims to go forward where the plaintiff and the defendant had a contractual relationship). However, the plaintiffs incorrectly assume that such a determination – that claims of strict products liability and breach of implied warranty "are one and the same," Pls.' Jt. Opp'n at 8 – saves their implied warranty claims. Pls.' Jt. Opp'n at 6-9. To the contrary, where a plaintiff alleges claims for both strict products liability and breach of implied warranties based on allegedly defective products against a party not in privity with the plaintiff, the implied warranty claims must be dismissed because the actions are the same. See, e.g., Liberty Mut. Ins. Co., 646 F. Supp. 2d at 56 (denying permission to bring breach of implied warranty claim where the parties were not in privity of contract, because, under such circumstances, the plaintiff could only bring a claim in tort). Accordingly, the Court grants Alstom's motion to dismiss Counts 11 and 15 of the Master Complaint and Counts 4 and 6 of the McMillan Estate Complaint.[24]

     3.     Do the Plaintiffs Fail to Allege an Express Warranty of Future Performance?

Breach of express warranty claims are subject to the four-year UCC statute of limitations.[25] See U.C.C. § 2-725; D.C. Code § 28:2-725. As previously noted, the statute of

---

[24] Because the Court has determined that the implied warranty claims must be dismissed, the Court need not determine whether the implied warranty claims are subject to the UCC's statute of limitations or whether the discovery rule applies to the plaintiffs' implied warranty claims.

[25] Even though the parties dispute whether the implied warranty claims arise under contract (and thus are subject to the UCC) or under tort law, neither party contends, or even implies, that the express warranty claim is not subject to

(continued...)

limitations begins to run at the time of delivery, unless the warranty "explicitly extends to future performance of the goods." D.C. Code § 28:2-725(2). Alstom contends that the plaintiffs have not alleged any express warranties of future performance, and therefore, the statute of limitations began to run in the 1970s, when its component parts were delivered to the WMATA. Def.'s Mem. at 20. The plaintiffs request that the Court defer its ruling on this issue until after discovery has been conducted, Pls.' Jt. Opp'n at 11, and the McMillan Estate adds that Alstom made an express guarantee of future performance in its contract with the WMATA, McMillan Estate Opp'n at 16.

For a warranty of future performance to exist under D.C. Code section 28:2-725, "the terms of the warranty must <u>unambiguously</u> and <u>explicitly</u> indicate that the manufacturer is warranting the future performance of the goods for a specified period of time." <u>In re Lone Star Indus. Inc.</u>, 776 F. Supp. 206, 219 (D. Md. 1991) (emphasis added) (citing <u>R.W. Murray Co. v. Shatterproof Glass Corp.</u>, 697 F.2d 818 (8th Cir.1983)). "The future performance exception is construed narrowly, and courts have been very harsh in determining whether a warranty explicitly extends to future performance." <u>Miles v. Raymond Corp.</u>, 612 F. Supp. 2d 913, 926 (N.D. Ohio 2009) (internal quotation marks omitted) (quoting <u>Standard Alliance Indus., Inc. v. Black Clawson Co.</u>, 587 F.2d 813, 820 (6th Cir. 1978)); <u>cf.</u> <u>South Jersey Gas Co. v. Mueller Co.</u>, No. 09-4194 (RBK-JS), 2010 WL 1742542, at *5 (D.N.J. April 27, 2010) (noting that the requirement of specificity is the hallmark distinction between a warranty of future performance and all other warranties because "all warranties refer to the future, [but] all warranties do not explicitly extend to future performance"). Two requirements limit the recognition of such

_____

(...continued)
the UCC's statute of limitations.

warranties.  First, the requirement that the warranty extend to future performance means that the warranty cannot simply be a representation of the product's condition at the time of delivery. South Jersey Gas Co., 2010 WL 1742542, at *5; Winchester Homes, Inc. v. Hoover Universal, 39 Va. Cir. 107 (Va. Cir. Ct. 1996).  Second, the warranty must reference a "specific future time period during which the goods are warranted to perform."  South Jersey Gas Co., 2010 WL 1742542, at *5 (emphasis added); see also Miles, 612 F. Supp. 2d at 926 ("Emphasizing the word 'explicitly,' [courts] have ruled that there must be specific reference to a future time in the warranty."); In re Lone Star Indus. Inc., 776 F. Supp. at 219 ("For a warranty of future performance to exist . . . , the terms of the warranty must unambiguously and explicitly indicate that the manufacturer is warranting the future performance of the goods for a specified period of time.  The term 'explicit' has been defined as 'not implied merely, or conveyed by implication; distinctly stated; plain language; clear; not ambiguous; express; unequivocal.'" (internal citation omitted) (quoting Binkley Co. v. Teledyne Mid-America Corp., 333 F. Supp. 1183 (E.D. Mo. 1971)).

 

 

       a.       The complaints fail to allege any express warranty of future performance

The complaints in this case fail to adequately allege any express warranties of future performance.  The Master Complaint states that Alstom

> expressly warranted via [its] marketing, advertisements, warranties, sales literature, owners manuals, and other representations that [its] product(s) and in particular . . . the automatic train control system . . . [were] fit for the purpose for which they were intended, namely the safe transportation of fare-paying and other foreseeable users of the WMATA subway system.

Compl. ¶ 274.  This paragraph does not come close to adequately alleging any express warranty of future performance.  See, e.g., Miles, 612 F. Supp. 2d at 926 & n.12 (holding that a complaint which stated that the defendants made and breached express warranties, "including but not limited to warranties concerning the alleged proper, safe and/or fitness for use of this forklift in the area of horizontal shelves where the height of the first shelf exceeds the height of the forklift's operator panel," failed to adequately allege the existence of any warranty of future performance (internal quotation marks omitted)).  The plaintiffs do not specifically identify any express warranty made by Alstom that included an explicit statement warranting the future performance of the automatic train control system, nor do the plaintiffs identify any reference to a specific future time period.  Thus, the complaints fail to set forth a cognizable UCC-based breach of express warranty claim that is not time-barred.

   b.      The Alstom/GRS contract with the WMATA did not include an express warranty of future performance

   For several reasons, the Alstom/GRS contract also fails to establish an express warranty of future performance.  First, the plaintiffs do not reference the WMATA contract anywhere in their complaints, and therefore, the contract itself cannot be considered in deciding Alstom's motion to dismiss.  See St. Francis Xavier Parochial Sch., 117 F.3d at 624 (stating that the Court "may consider [in deciding a 12(b)(6) motion to dismiss] only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice").  Second, even if the complaints were amended to include the language relied upon by the McMillan Estate, an express warranty of future performance would still not be adequately asserted.  The particular contract language the McMillan Estate points to all fall under the sub-heading "Fail-Safe Design Criteria," and include the following statements:

(1) "[a]ny amplifier breaking into spurious oscillations shall not result in an unsafe condition," McMillan Estate Opp'n, Ex. E (Contract); (2) the "automatic train control system and components would be fail-safe," McMillan Estate Opp'n at 16, because "[s]elf-detecting component or system failures shall cause the train(s) to stop or run at a safe, more restrictive speed than that permitted with no failure," McMillan Estate Opp'n, Ex. E (Contract); and (3) "[c]omponent or system failures which are not self-detecting shall not cause unsafe conditions, even if added to other failures," id.  None of these statements, either individually or collectively, qualify as anything more than a description of the product's condition at the time of delivery. See South Jersey Gas Co., 2010 WL 1742542, at *5 ("A warranty that explicitly extends to future performance of goods . . . is more than a mere representation [of] the condition of a product at the time of delivery."); Travelers Indem. Co. v. Dammann & Co., Inc., 592 F. Supp. 2d 752, 764 (D.N.J. 2008) (stating that a warranty of future performance cannot be "a mere representation of the product's condition at the time of delivery" (internal quotation marks omitted)); Winchester Homes, Inc., 39 Va. Cir. 107 (same).  Furthermore, none of these statements designate a defined future period of time during which the alleged warranty would apply.  See Joswick v. Chesapeake Mobile Homes, Inc., 765 A.2d 90, 96 (Md. 2001) ("There is no problem when the warranty simply states that the goods have a certain positive quality or are free from all or certain defects but states no time period during which the goods will continue to have that quality.  That kind of warranty does not reference or extend to any future performance."); see also, e.g., Travelers Indem. Co., 592 F. Supp. 2d at 764 (holding that seller's guaranty that vanilla beans would not contain pesticides, radiation or radioactive contaminants at unsafe levels did not concern "future performance" because it contained no specific reference to

a future time period); Winchester Homes, Inc., 39 Va. Cir. 107 (holding that statements like "[the product] penetrates deep into the wood providing permanent protections (against combustion) and . . . maintains its structural strength long after other building materials have failed under similar fire conditions" and "[the product] is a Class A or Class 1 retardant wood product that passed [flamespread testing]," are not explicit guarantees of the future performance of the product for a specified period of time). But see Joswick, 765 A.2d at 95-97 (holding that warranty that mobile home would be "free from substantial defects of material and workmanship under normal use and service for a period of twelve (12) months from the date of delivery to the first retail purchaser" explicitly extended to future performance).

For all of the foregoing reasons, Count 12 of the Master Complaint and Count 5 of the McMillan Estate Complaint must be dismissed. However, the Court will dismiss these counts without prejudice, and permit the plaintiffs to move for reconsideration of the Court's ruling if discovery reveals that Alstom made any express warranties that explicitly guarantee future performance for a specified period of time that encompasses the date of the accident in this case.

C.     Alstom's Duplicative and Derivative Claims Challenges

1.     Counts 14 and 7[26]

Count 14 of the Master Complaint asserts a claim against the defendants for negligent train traffic control. The gravamen of this claim is that the defendants "owed a duty of reasonable care of providing accurate train traffic control equipment, software and support, in order for all WMATA passengers . . . to travel safely," Compl. ¶ 284, and that this duty was

_____

[26] The Court notes that the McMillan Estate Complaint only alleges one count of negligent train traffic control – Count 1. Therefore, only Counts 14 and 7 of the Master Complaint are at issue in this section of the opinion.

breached by the defendants' failing to (1) "properly maintain its computer safety warning system," id. ¶ 296, and (2) "properly design, install, inspect, test[,] and maintain its computer warning system of notice . . . designed to prevent the two WMATA trains from colliding," id. ¶ 297. This claim is a mere restatement – almost verbatim – of Count 7, which similarly alleges that the defendants breached their duty to provide accurate and safe train traffic control "[b]y failing to properly maintain its computer safety warning system," id. ¶239, and "failing to properly design, install, inspect, test[,] and maintain its computer warning system of notice . . . to prevent the two WMATA trains from colliding," id. ¶ 240. See also id. ¶ 228. The legal theory for the plaintiffs' negligent train traffic control claims (Counts 7 and 14) is therefore identical.

In short, Count 14's negligent train traffic control claim is entirely duplicative of the negligent train traffic control claim pleaded in Count 7. Accordingly, Count 14 "rests on the same factual allegations . . . , would be decided under the same legal standards . . . , and authorizes the same forms of relief" as Count 7. Iacangelo v. Georgetown Univ., No. 05-2086 (PLF), 2011 WL 149852, at *2 (D.D.C. January 19, 2011). The Court therefore will require that the plaintiffs choose which of the two counts they desire to pursue. Upon being advised of that decision, the other claim will be dismissed by the Court.

2.      Counts 16 and 17

Alstom contends that because Counts 7, 9, 10, 11, 12, 14, and 15 of the Master Complaint, and Counts 1, 2, 3, 4, 5, 6, and 8 of the McMillan Estate Complaint, should be dismissed, that Counts 16 and 17 of the Master Complaint, and the corresponding Counts 9 and 10 of the McMillan Estate Complaint, should also be dismissed as derivative of the other dismissed claims. Def.'s Mem. at 22. In the District of Columbia, "a wrongful death action is

derivative in nature" and under both the wrongful death and survival statutes, "the plaintiff . . .

needs a viable cause of action at the time of death." <u>Nelson v. Am. Nat'l Red Cross</u>, 26 F.3d

193, 199 (D.C. Cir. 1994).[27]  While the Court has dismissed some of the other claims (Counts 11,

12, and 15 of the Master Complaint and the corresponding counts of the McMillan Estate

Complaint – Counts 4, 5, and 6) upon which the wrongful death and survival claims are based,

several of those claims survived (Counts 9 and 10 of the Master Complaint and Counts 1, 2, 3,

and 8 of the McMillan Estate Complaint).  Therefore, the wrongful death and survival claims

survive the Court's partial grant of Alstom's motion to dismiss.  The Court therefore denies

Alstom's motion to dismiss Counts 16 and 17 of the Master Complaint and Counts 9 and 10 of

the McMillan Estate Complaint.

### IV. Conclusion

For the foregoing reasons, Alstom's motion to dismiss is granted in part and denied in

part.  The Court's ruling is summarized as follows.  Alstom's arguments that the plaintiffs'

negligence and strict products liability claims (Counts 7, 9, 10, and 14 of the Master Complaint

and Counts 1, 2, 3, and 8 of the McMillan Estate Complaint) should be dismissed as barred by

the statute of repose fail, except to the extent that these claims extend to Alstom in its capacity as

---

[27]  The District of Columbia Survival Act provides: "On the death of a person in whose favor or against whom a right
of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or
against the legal representative of the deceased."  D.C. Code § 12-101.

The District of Columbia Wrongful Death Act provides, in relevant part:

> When, by an injury done or happening within the limits of the District, the death of
> a person is caused by the wrongful act . . . and the act . . . is such as will, if death
> does not ensue, entitle the person injured . . . to maintain an action and recover
> damages, the person who or corporation that is liable if death does not ensure is
> liable to an action for damages for the death, notwithstanding the death of the
> person injured . . . .

D.C. Code § 16-2701(a).

a designer.  Also, the Court's CMO and subsequent orders permit the McMillan Estate to file separate claims involving issues it deems "substantially different" from those pleaded in the Master Complaint, and therefore, Count 8 of the McMillan Estate Complaint may be pursued because it is reasonably deemed substantially different from Count 10 of the Master Complaint. Furthermore, although the plaintiffs adequately pleaded their implied warranty claims, the Court agrees with Alstom that the implied warranty claims are duplicative of the strict products liability claims.  In addition, the Court agrees with Alstom that the express warranty claim is barred by the statute of limitations.  Moreover, the Court agrees with Alstom that Count 14 of the Master Complaint is duplicative of Count 7 of the Master Complaint.  Finally, because some causes of action on which the wrongful death and survival actions are based survived Alstom's motion to dismiss, both the wrongful death and survival claims survive the Court's partial grant of Alstom's motion.

Based on these rulings, the Court denies Alstom's motion to dismiss as to Counts 7, 9, 10, 16, and 17 of the Master Complaint and Counts 1, 2, 3, 8, 9, and 10 of the McMillan Estate Complaint, and grants the motion to dismiss Counts 11, 12, and 15 of the Master Complaint and Counts 4, 5, and 6 of the McMillan Estate Complaint.  However, the Court is dismissing Count 12 of the Master Complaint and Count 5 of the McMillan Estate Complaint without prejudice, and therefore, the plaintiffs may move for reconsideration of the dismissal of these claims if discovery reveals that Alstom made any express warranties that explicitly guarantee future performance for a specified period of time that encompasses the date of the event that is the subject of this case.  The plaintiffs must also inform the Court of whether it desires to pursue Count 7 or 14 of the Master Complaint, which will result in dismissing the other claim.

**SO ORDERED** this 22nd day of June, 2011.[28]

REGGIE B. WALTON
United States District Judge

---

[28]  The Court is contemporaneously issuing an order consistent with this Memorandum Opinion.