**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| IN THE MATTER OF THE<br>FORT TOTTEN METRORAIL CASES<br>Arising Out of the Events of June 22, 2009 | )<br>)<br>)<br>)<br>) |
| | ) |
| LEAD CASE: <u>Jenkins v. Washington</u><br><u>Metropolitan Area Transit Authority, et al.</u> | )   Miscellaneous Case No. 10-314 (RBW)<br>)<br>) |
| | ) |
| THIS DOCUMENT RELATES TO:<br>ALL CASES | )<br>) |
| | ) |

_____

## MEMORANDUM OPINION

This action was instituted on behalf of individuals who were killed or injured in a

collision between two Washington Metropolitan Area Transit Authority ("WMATA") trains that

occurred on June 22, 2009, near WMATA's Fort Totten Metrorail station.  Currently before the

Court are the following seven contested dispositive motions: (1) WMATA's motion to dismiss

Alstom Signaling, Inc.'s ("Alstom") statute of repose affirmative defense, ECF No. 353;[1] (2)

Ansaldo STS USA, Inc.'s ("Ansaldo") motion for judgment on Counts 7, 11, and 15 of the

Second Amended Master Complaint, ECF No. 367; (3) WMATA's motion to dismiss the

equitable indemnification cross-claims against it, ECF No. 424; (4) Alstom, Ansaldo, and

ARINC Incorporated's ("ARINC") (collectively "corporate defendants") joint motion for

summary judgment on all claims, ECF No. 425; (5) Ansaldo's motion for summary judgment,

ECF No. 426; (6) Alstom's motion for summary judgment, ECF No. 427; and (7) ARINC's

---

[1] In this Memorandum Opinion, the Court will cite to the parties' filings by referencing the document number
generated by the Court's electronic case filing system ("ECF No."), followed by the page number assigned to the
document by the filing party.

motion for summary judgment, ECF No. 428.  Upon careful consideration of the parties'

submissions, the Court concludes for the following reasons that (1) WMATA's motion to

dismiss Alstom's statute of repose defense must be granted in part and denied in part; (2)

Ansaldo's motion for judgment on Counts 7, 11, and 15 of the Second Amended Master

Complaint must be granted; (3) WMATA's motion to dismiss the equitable indemnification

cross-claims against it must be granted; (4) the corporate defendants' motion for summary

judgment must be denied; (5) Ansaldo's motion for summary judgment must be denied; (6)

Alstom's motion for summary judgment must be denied; and (7) ARINC's motion for summary

judgment must be granted in part and denied in part.

## I. <u>Standards of Review</u>

### A.     **Motion to Dismiss under Rule 12(b)(1)**

When a defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(1),

"the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court

has subject matter jurisdiction." <u>Biton v. Palestinian Interim Self-Gov't Auth.</u>, 310 F. Supp. 2d

172, 176 (D.D.C. 2004); <u>see</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).  A court

considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in

the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all

inferences that can be derived from the facts alleged.'" <u>Am. Nat'l Ins. Co. v. FDIC</u>, 642 F.3d

1137, 1139 (D.C. Cir. 2011) (quoting <u>Thomas v. Principi</u>, 394 F.3d 970, 972 (D.C. Cir. 2005)).

However, "the district court may consider materials outside the pleadings in deciding whether to

grant a motion to dismiss for lack of jurisdiction." <u>Jerome Stevens Pharm., Inc. v. FDA</u>, 402

F.3d 1249, 1253 (D.C. Cir. 2005) (citing <u>Herbert v. Nat'l Acad. of Sciences</u>, 974 F.2d 192, 197

(D.C. Cir. 1992)).

**B.      Motion for Judgment on the Pleadings under Rule 12(c)**

Federal Rule of Civil Procedure 12(c) permits "a party [to] move for judgment on the pleadings" so long as the motion is made "[a]fter the pleadings are closed—but early enough not to delay trial."  "The standard for a motion for judgment under Rule 12(c) is essentially the same standard as a motion to dismiss under Rule 12(b)(6)."  Rollins v. Wackenhut Servs., 802 F. Supp. 2d 111, 116 (D.D.C. 2011) (citing, among others, Schuchart v. La Taberna Del Alabardero, Inc., 365 F.3d 33, 35 (D.C. Cir. 2004)).  Accordingly, when considering a Rule 12(c) motion, "the court must accept the nonmovant's allegations as true and should view the facts in the light most favorable to the nonmovant."  Bowman v. District of Columbia, 562 F. Supp. 2d 30, 32 (D.D.C. 2008).  "The court should grant a motion for judgment on the pleadings if the movant 'is entitled to judgment as a matter of law.'"  Id. (quoting Burns Int'l Sec. Servs. v. Int'l Union, 47 F.3d 14, 16 (2d Cir. 1995)).

**C.      Motion for Summary Judgment under Rule 56**

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of showing the absence of a disputed material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id.  "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party."  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir.

3

2011) (citing <u>Anderson</u>, 477 U.S. at 255).  "Although summary judgment is not the occasion for the court to weigh credibility or evidence, summary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  <u>Id.</u> (citations omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party."  <u>Anderson</u>, 477 U.S. at 249.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could <u>reasonably</u> find for the [non-moving party]."  <u>Id.</u> at 252 (emphasis added).

## II.  <u>WMATA's motion to dismiss Alstom's statute of repose affirmative defense</u>[2]

### A.    Introduction

Alstom asserts, as an affirmative defense, that WMATA's cross-claims for contribution and contractual indemnity are time-barred under the District of Columbia's ("District") statute of repose.  WMATA moves to dismiss this affirmative defense, arguing that its cross-claims fall under two exceptions to the District's statute of repose: (1) the exception for claims asserted by the District of Columbia government, and (2) the exception for claims based on a contract.

The Court concludes that WMATA's cross-claim for <u>contractual indemnity</u> falls under the statute of repose's exception for claims based on a contract, but that its cross-claim for <u>contribution</u> does not.  The Court also concludes that neither cross-claim falls under the statute of

---

[2] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) the Memorandum in Support of WMATA's Motion to Dismiss Alstom's Statute of Repose Affirmative Defense [ECF No. 353-1]; (2) Alstom Signaling Inc's Opposition to WMATA's Motion to Dismiss Alstom's Statute of Repose Affirmative Defense [ECF No. 382]; and (3) the Reply Memorandum in Support of WMATA's Motion to Dismiss Alstom's Statute of Repose Affirmative Defense [ECF No. 396].

repose's exception for claims brought by the District.  Accordingly, WMATA's motion is granted in part and denied in part.

**B.      Background**

WMATA filed a cross-claim against Alstom containing two counts: Count I is for contribution, and Count II is for contractual indemnity.  See ECF No. 140 ¶¶ 84-90.  The contribution claim asserts that if WMATA is found liable to the plaintiffs, WMATA is entitled to contribution from Alstom with respect to damages proximately caused by Alstom's negligently and defectively designed automatic train control system.  Id. ¶¶ 85-86.  The contractual indemnity claim asserts that if WMATA is found liable to the plaintiffs, it is entitled to indemnification from Alstom pursuant to several provisions of a contract between the parties.  Id. ¶ 88.  In its Answer to WMATA's cross-claim, Alstom asserts that WMATA's cross-claims for contribution and indemnification are time-barred under the District's statute of repose.  ECF No. 178 ¶ 10.

The District's statute of repose bars "any action" for "personal injury" or "wrongful death . . . resulting from the defective or unsafe condition of an improvement to real property" if the injury or death occurs more than ten years after the "improvement was substantially completed." D.C. Code § 12-310(a)(1)(A) (2001).[3]  The statute also bars any action "for contribution or indemnity which is brought as a result of such injury or death" if the injury or death occurs more than ten years after the "improvement was substantially completed."  Id. § 12-310(a)(1)(B). However, the statute's ten-year limitations period does not apply to, among other lawsuits, "any

---

[3] The parties do not dispute that WMATA's cross-claim against Alstom arises from an allegedly "defective or unsafe condition of an improvement to real property."  Id.

action based on a contract, express or implied," <u>id.</u> § 12-310(b)(1), or "any action brought by the District of Columbia government," <u>id.</u> § 12-310(b)(4).

WMATA now moves for judgment on the pleadings under Rule 12(c), contending that Alstom's statute of repose defense fails as a matter of law because WMATA's cross-claim falls under both of the foregoing exceptions to the statute of repose.  First, WMATA argues that the statute's exception for "any action brought by the District of Columbia government," <u>id.</u> § 12-310(b)(4), applies because WMATA is an agency of the District under the terms of the interstate compact that created it, and thus should be treated as "the District of Columbia government" for the purposes of the statute of repose, ECF No. 353-1 at 5.  It further contends that even if § 12-310(b)(4) is construed to apply only when the District is suing to vindicate public rights, the exception still applies here because WMATA's cross-claim against Alstom seeks to protect the public from negligent design defects in Alstom's train control system, and to replenish WMATA's treasury to enable it to perform a public function (i.e., rail transportation).  <u>See id.</u> at 11-15.  Second, WMATA maintains that the statute of repose's exception for "any action based on a contract, express or implied," D.C. Code § 12-310(b)(1), also applies because its cross-claim against Alstom is primarily based on the contract between the parties, ECF No. 353-1 at 16-18.

The majority of Alstom's opposition brief focuses on the merits of WMATA's cross-claim (i.e., WMATA's entitlement to contribution and indemnity from Alstom).  These arguments, however, are irrelevant to the issues presented in WMATA's motion, and will be considered by the Court only in the context of Alstom's motion for summary judgment (which is discussed <u>infra</u> in this Memorandum Opinion).  Alstom makes only one argument responsive to WMATA's motion: it contends that the statute of repose's exception for "any action brought by

the District of Columbia government," id. § 12-310(b)(4), does not apply here because (1)

WMATA is not "the District of Columbia government," and (2) even if it were, this statutory

exception applies only when the District's lawsuit vindicates a public right, and WMATA's

cross-claim to recover the costs of its own negligence vindicates no such right.  See ECF No. 382

at 7-12.

## C.     Analysis

Notwithstanding the order in which WMATA presents it arguments, the Court finds that

its strongest position is based on the statute of repose's exception for contract claims.  The Court

thus considers the applicability of that exception first, and then turns to the exception for claims

asserted by the District.

### 1.     Does the statute of repose's exception for "any action based on a contract," § 12-310(b)(1), apply to WMATA's cross-claim against Alstom?

As noted, WMATA's cross-claim asserts two counts: Count I for contribution, and Count

II for contractual indemnity.  See ECF No. 140 ¶¶ 84-90.  Despite WMATA's misleading

argument that its cross-claim against Alstom is "primarily" based on a contract, its contribution

cross-claim plainly sounds in tort, not contract.  See id. ¶ 85 (seeking contribution from Alstom

insofar as its negligence proximately caused WMATA's liability, and not referencing any

contract).  And "[c]ontribution is one of several theories used to apportion damages among

tortfeasors to an injured party."  D.C. v. Wash. Hosp. Cent., 722 A.2d 332, 336 (D.C. 1998)

(emphasis added).  Thus, WMATA's contribution cross-claim is not exempt from the statute of

repose under § 12-310(b)(1).

WMATA's contractual indemnity cross-claim is another story.  This claim asserts that

Alstom is contractually bound to indemnify WMATA for any damages it pays to the plaintiffs.

See ECF No. 140 ¶¶ 88-90.  Because this claim is "based on a contract" between Alstom and

WMATA, it is exempt from the statute of repose under § 12-310(b)(1).

> **2.    Does the statute of repose's exception for "any action brought by the District of Columbia government," § 12-310(b)(4), apply to WMATA's cross-claim against Alstom?**

Determining the applicability of this exception entails three, interrelated questions: First,

should WMATA be considered "the District of Columbia government" within the meaning of §

12-310(b)(4)?  Second, if WMATA is the District government for purposes of § 12-310(b)(4),

does this provision exempt from the statute of repose any action filed by WMATA, or only those

actions brought to enforce public rights?  And third, if § 12-310(b)(4) only exempts those actions

brought to enforce public rights, does WMATA's cross-claim against Alstom seek to enforce

such a right?[4]

> **i.    Is WMATA "the District of Columbia government" within the meaning of § 12-310(b)(4)?**

"WMATA was created by an interstate compact entered into by the District of Columbia

and the states of Maryland and Virginia."  Watters v. WMATA, 295 F.3d 36, 39 (D.C. Cir.

2002).  The interstate compact establishes that WMATA is "an instrumentality and agency of

each of the signatory parties," which includes the District.  D.C. Code § 9-1107.01, art. III, § 4

(2001); see also id., art. II, § 2 ("The purpose of this Title is to create a regional instrumentality,

as a common agency of each signatory party.").  Nevertheless, "[s]ince WMATA's conception in

1981, the unique nature of the compact has spawned a great deal of litigation regarding the

proper scope of WMATA's jurisdiction and liability," with many cases turning upon "whether

---

[4] It bears noting that the applicability of this statute of repose exception is critical only to WMATA's contribution claim (Count II) since, as explained above, WMATA's contractual indemnity claim (Count I) plainly falls into the statute of repose's exception for contract claims.

WMATA can be considered an agency of the District of Columbia." Griggs v. WMATA, 66 F.

Supp. 2d 23, 27 (D.D.C. 1999) (surveying caselaw where WMATA is treated as a District

agency for some purposes, but not others).  The determination of whether WMATA is part of the

District government, in other words, varies depending on the particular circumstances of each

case.  See id.

The issue here is whether WMATA should be considered "the District of Columbia

government" within the meaning of the statute of repose's exception for "any action brought by

the District of Columbia government."  D.C. Code § 12-310(b)(4).  The Court concludes that it

should for the following reasons.

D.C. Code § 12-310(b)(4) was enacted as part of the District of Columbia Statute of

Limitations Amendment Act of 1986.  D.C. Water & Sewer Auth. ("WASA") v. Delon Hampton

Assocs., 851 A.2d 410, 414 (D.C. 2004).  The D.C. Court of Appeals has recognized that this

legislation codified the common law doctrine of nullum tempus ("no time runs against the

sovereign").  See id. ("[A]n underlying aim of the [D.C.] Council" in enacting the law "was to

ensure that the District received, at the least, the benefit of the common law principle of 'nullum

tempus.'").  Under the doctrine of nullum tempus, "sovereigns enjoy a common-law immunity

from the operation of statutes of limitations and repose . . . when [they] sue[] to vindicate public

rights."  D.C. v. Owens-Corning Fiberglas Corp., 572 A.2d 394, 401, 406 (D.C. 1989).  Of

particular relevance here, nullum tempus immunity is generally considered a type of sovereign

immunity.  See Solid Rock Church, Disciples of Christ v. Friendship Pub. Charter Sch., Inc., 925

A.2d 554, 559-60 (D.C. 2007) ("[T]he District . . . enjoys limited sovereign immunity from the

operation of statutes of limitation under the common law doctrine of nullum tempus." (emphasis

added)); Owens-Corning, 572 A.2d at 405 (noting that "[s]ince Congress is sovereign in the

District, it enjoys the usual sovereign immunities, including the benefit of nullum tempus"
(emphasis added)); accord Shootman v. Dep't of Trans., 926 P.2d 1200, 1206 (Colo. 1996)
("[N]ullum tempus is simply an aspect of sovereign immunity."); New Jersey Educ. Facilities
Auth. v. Gruzen, 592 A.2d 559, 561 (N.J. 1991) (same); Wash. Suburban Sanitary Comm'n v.
Pride Homes, 435 A.2d 796, 801 (Md. 1981) (same).  This point is significant because, in
signing the interstate compact, Maryland, Virginia, and the District "conferred each of their
respective sovereign immunities" on WMATA.  Watters, 295 F.3d at 39.  The Fourth Circuit has
consequently interpreted the interstate compact's conferral of sovereign immunity on WMATA
to include immunity from Virginia's statute of limitations.  See Delon Hampton v. WMATA,
943 F.2d 355, 359 (4th Cir. 1991) (stating that, "[a]s a general proposition, an agency of the state
shares the same privileges as that of the state, including sovereign immunity," and holding that
WMATA, "as an agency and instrumentality of the Commonwealth of Virginia," was "exempt
from application of the statute of limitations" pursuant to Virginia statute which codified nullum
tempus).  Employing similar reasoning here, this Court concludes that WMATA derives nullum
tempus immunity from the District because it is an agency of the District that shares its sovereign
immunity, and that WMATA consequently qualifies as the "District of Columbia government"
within the meaning of § 12-310(b)(4).[5]

Resisting this conclusion, Alstom relies upon the D.C. Court of Appeals' decision in
WASA, 851 A.2d at 414.  There, the court held that the "functions and activities of WASA [the
D.C. Water and Sewer Authority], a separate corporate body distinct from the District of

---

[5] Even if WMATA does not fall within the exception to the statute of repose codified at § 12-310(b)(4), it would still be entitled, as an agency of the District, to common law nullum tempus immunity, so long as it brought its lawsuit to vindicate a public right.  See Owens-Corning, 572 A.2d at 401.

Columbia, are proprietary in nature and thus beyond the protection of <u>nullum</u> <u>tempus</u>" and, in turn, outside the exception to the statute of limitations for "actions brought by the District of Columbia government" codified at D.C. Code § 12-301 (2001). <u>Id.</u> at 416. To be sure, WASA and WMATA have many similarities—they are both public-private hybrid entities, they can both sue and be sued in their own names, and they can enter into contracts with the District. <u>Compare</u> D.C. Code §§ 43-1672, 43-1673 (2001) (WASA enabling legislation), <u>with</u> D.C. Code § 9-1107.1, Tit. III, Art. II, § 2; <u>id.</u>, Art. V, §§ 12(a), 12(f) (2001) (WMATA Compact). However, whereas WASA's enabling legislation makes clear that it is "an <u>independent</u> authority of the District government" and a "corporate body . . . that has a <u>separate legal existence</u> within the District government," D.C. Code § 34-2202.02(a) (2001) (emphasis added), the interstate compact declares that WMATA is "an instrumentality and agency of each of the signatory parties," including the District. D.C. Code § 9-1107.01, art. III, § 4 (2001). And WMATA derives sovereign immunity from the District, <u>see</u> <u>Watters</u>, 295 F.3d at 39, which includes <u>nullum</u> <u>tempus</u> immunity. WASA apparently does not. Because of these key distinctions between WASA and WMATA, Alstom's reliance on <u>WASA</u> is misplaced.

> **ii.** **Does § 12-310(b)(4) exempt from the statute of repose <u>any</u> action filed by the District/WMATA, or only those actions brought to enforce public rights?**

Even though WMATA may be treated as the District government for purposes of § 12-310(b)(4), that does not end the Court's inquiry. According to Alstom, § 12-310(b)(4) merely codifies the doctrine of <u>nullum</u> <u>tempus</u>, and thus only exempts lawsuits from the statute of repose when the District is seeking to enforce a public right. ECF No. 382 at 8-9. WMATA, on the other hand, emphasizes that the plain language of § 12-310(b)(4) applies to "any action brought by the District of Columbia government," regardless of whether the suit is brought to enforce a

11

public right.  ECF No. 396 at 11-12.  In support of this position, WMATA highlights a passage from <u>WASA</u> where the court of appeals stated that § 12-310 was designed "to ensure that the District received, <u>at the least</u>, the benefit of the common law principle of '<u>nullum</u> <u>tempus</u>.'" 851 A.2d at 414 (emphasis added).  The court's inclusion of the phrase "at the least," WMATA contends, suggests that § 12-310 extends beyond <u>nullum</u> <u>tempus</u> immunity.  ECF No. 396 at 11. The Court disagrees.

While WMATA's position may find support in stray phrases from <u>WASA</u>, the actual reasoning of that decision indicates that § 12-310(b)(4) only codifies <u>nullum</u> <u>tempus</u> and extends no further.[6]  Indeed, the <u>WASA</u> court did not simply analyze whether WASA was an agency of the District and therefore within the scope of § 12-301's exemption to the statute of limitations. It instead surveyed legislative history which showed that "a purpose of the draft bill was to 'make clear that the limitations provisions of § 12-301 and § 12-310 of the D.C. Code do not apply to the District government <u>when it sues to enforce public rights</u>.'"  <u>Id.</u> at 414 (citation omitted).  Accordingly, "in deciding what juridical entities the [D.C.] Council intended to encompass within the phrase 'District of Columbia government,'" the court deemed it "useful to determine <u>whether th[e] action brought by WASA was brought to enforce a public right</u>."  <u>Id.</u> (emphasis added).  After discussing District of Columbia case law concerning the application of <u>nullum</u> <u>tempus</u> immunity, the court found that the "functions and activities of WASA, a separate corporate body distinct from the District of Columbia are proprietary in nature and thus beyond

---

[6] Although <u>WASA</u> concerned D.C. Code § 12-301, which exempts "actions brought by the District of Columbia government" from the statute of limitations, the court's analysis is equally applicable to the statute of repose exception for actions brought by the District codified at § 12-310(b)(4), insofar as § 12-301 and § 12-310(b)(4) use identical language and were both enacted as part of the District of Columbia Statute of Limitations Amendment Act of 1986.  <u>See</u> <u>id.</u> at 414.

the protection of <u>nullum tempus</u>," which, in turn, led the court to "hold that the phrase 'District

of Columbia government' in § 12-301 does not encompass the separate juridical entity of which

WASA consists." <u>Id.</u> at 416.  This analysis indicates that the D.C. Court of Appeals construes §§

12-301 and 12-310 as merely coextensive with, but no broader than, the principle of <u>nullum</u>

<u>tempus</u>.  Subsequent decisions confirm this view.  <u>See, e.g.</u>, <u>Solid Rock Church</u>, 925 A.2d at

559-60 ("The law is settled that the District of Columbia, as a municipality, enjoys limited

sovereign immunity from the operation of statutes of limitation under the common law doctrine

of <u>nullum tempus</u>, and under D.C. Code § 12-301 (2001), <u>while in the performance of public</u>

<u>functions</u>." (emphasis added)); <u>D.C. Housing Auth. v. D.C. Office of Human Rights</u>, 881 A.2d

600, 609 (D.C. 2005) (noting that § 12-301 was amended "in 1986 to ensure that the statute of

limitations does not prevent the District government from bringing suit <u>to enforce public rights</u>"

(emphasis added)).[7]

---

[7] It also makes good sense to exempt the District from the statutes of limitations and repose <u>only</u> when it sues to enforce public rights.  As the D.C. Court of Appeals explained in its discussion of the evolution of the <u>nullum tempus</u> doctrine:

> Like immunity from suit, the sovereign exemption from the running of time originated as a royal privilege, and perhaps survived the Revolution more by force of habit or precedent than by reason. . . . Ultimately, it seems, the lone explanation of historical prerogative was unsatisfactory, perhaps because, in arbitrary fashion, it seemed to give the government a right that was withheld from the people. . . . Therefore the Supreme Court explained in <u>Guaranty Trust [Co. v. United States</u>, 304 U.S. 126, 132 (1938)], that the rule expresses a legitimate public policy of preserving "public rights, revenues, and property from injury or loss, by the negligence of public officers.  And although this is sometimes called a prerogative right, it is in fact nothing more than a reservation, or exception, introduced for the public benefit, and equally applicable to all governments." Thus, the policy of protecting the lawgiver was reunited with more democratic principles, for it was recognized that the people, as sovereign, are entitled to immunity from government functionaries' lax prosecution of public rights.  The inherent limitation of this doctrine, of course, is that the rights protected must be of a public nature, and not merely the private or proprietary interests of particular institutions.

<u>Owens-Corning</u>, 572 A.2d at 401 (internal citations and footnotes omitted).

### iii.   Does WMATA's cross-claim against Alstom seek to enforce a public right?

Having found that WMATA qualifies as the District government for purposes of § 12-310(b)(4), and that § 12-310(b)(4) only applies to claims brought to enforce a public right, the question now becomes whether WMATA's cross-claim against Alstom seeks to enforce a public right.  The Court concludes that it does not.

The D.C. Court of Appeals discussed the "public function requirement" of <u>nullum tempus</u> immunity at length in <u>Owens-Corning</u>:

> The government enjoys immunity from the running of time only when it sues to vindicate public rights.  Thus, our task will not be complete until we have determined whether, with respect to the particular issue on appeal, the District is suing to vindicate a public or a proprietary right.  This question is by no means an easy one.  The line between rights that accrue to the public's benefit and those that are ultimately proprietary to the government is a fine one, especially since any financial loss to the government is ultimately a loss to the public fisc.

> * * *

> In [<u>D.C. v. Weiss</u>, 263 A.2d 638 (D.C. 1970)], where we held that the District's suit to recover fees [from a patient treated for tuberculosis at] a public hospital was not barred by the statute of limitations, we said:

>> The District of Columbia is seeking to replenish its treasury of money expended by a public instrumentality in the exercise of a public function.  Recovery of the funds, which will benefit the public as a whole when applied to the continued operation of Glenn Dale Hospital, should not be made contingent on the diligence of public servants.

> 263 A.2d at 640.  This passage emphasizes the expenditure of the disputed monies by a public instrumentality, its application to a public function, and the policy against allowing the laxity of public servants to erect a bar to suit.  We stress, however, that while all monies the District sues upon affect the public fisc, it does not follow that every time the District sues for money it performs a public function.  While the line is hard to draw, it can fairly be stated that something more is required than a naked financial interest; thus in <u>Weiss</u> we spoke of replenishing the treasury of funds earmarked for the performance of a particular public function.  Where the District acquires a right of action directly related to its

14

> duty to perform a service to the public, or to vindicate an overwhelmingly public
> interest or right, a suit to recover money damages to enable the District to perform
> that service is public rather than proprietary.  Of course, there may be other
> considerations, unique to each case, which must guide future courts in
> determining whether the public function test is met.

572 A.2d at 406-407.  Applying these principles, the court in Owens-Corning held that the District's lawsuit seeking to recover costs for the removal of asbestos from roughly 2,400 public buildings was brought "to vindicate a public right" because the public "[u]nquestionably" had "a profound interest in the elimination of a danger so extreme and widespread."  Id. at 396, 407.

Drawing on Owens-Corning, WMATA maintains that its cross-claim against Alstom "seeks to protect the public at large from the negligent design defects in Alstom's automatic train control system."  ECF No. 353-1 at 13.  WMATA also contends that this case is analogous to Weiss because its cross-claim "seeks to replenish the public treasures of money expended, and potential liabilities incurred, in the exercise of a public function, i.e., providing rail transportation in the Washington, D.C. metropolitan area."  Id. at 15.  Alstom responds by arguing that, in contrast to the District's lawsuits in Owens-Corning and Weiss, WMATA's cross-claim "does not seek to recover any costs incurred by the District of Columbia in eliminating a public hazard such as asbestos or tuberculosis.  Rather, WMATA seeks to recover the costs which WMATA caused [the p]laintiffs to incur as a result of its own negligence—assuming it is found liable to [the p]laintiffs at trial—through equitable contribution as a joint tortfeasor and contractual indemnity of tort liability."  ECF No. 382 at 10 (emphasis in original).  Noting that WMATA's recovery for contribution and indemnity necessarily depends on WMATA being found liable in the first instance, Alstom argues that "WMATA's suit to recover the costs of its own wrongdoing is plainly not a public function."  Id. at 11 (emphasis in original).

The Court finds that WMATA's cross-claim against Alstom does <u>not</u> enforce a public right.[8]  First, WMATA's cross-claim bears no similarity to the claims asserted by the District in <u>Owens-Corning</u> and <u>Weiss</u>.  In both of those cases, the District took actions to secure the public health <u>first</u> (i.e., removing asbestos in <u>Owens-Corning</u> and paying for a hospital patient's tuberculosis treatment in <u>Weiss</u>), and <u>then</u> filed suit to recover the costs of those actions from the responsible parties.  WMATA took no similar actions here.  This is not a case, for instance, where WMATA <u>first</u> expended resources on fixing Alstom's allegedly faulty automatic train control system, and <u>then</u> brought suit to recover the costs of those remedial efforts.  Rather, WMATA took no action in the first instance, the train collision occurred, and it now seeks reimbursement from Alstom in the event that WMATA is itself found liable at trial.  In other words, rather than seeking reimbursement from a wrongdoer for proactive actions taken to prevent public harm, WMATA seeks reimbursement for Alstom's alleged share of the fault if <u>WMATA itself is deemed a wrongdoer</u>.  It is difficult to discern how the public's rights are vindicated by such a claim.  Second, the Court views as tenuous WMATA's argument that its cross-claim is <u>necessary</u> to protect the public from the alleged defects in Alstom's automatic train control system.  WMATA could (and should) independently evaluate the adequacy of Alstom's equipment, and if it is defective, take any necessary remedial steps.  Its cross-claim against Alstom is not <u>necessary</u> to achieve that end.  At most, WMATA's cross-claim will mitigate its own tort liability in this case, and thus will further a proprietary rather than a public interest.  While it is true that "any financial loss to the government is ultimately a loss to the

---

[8] The Court notes that an exhaustive search of the case law revealed no decision, either state or federal, discussing the applicability of <u>nullum</u> <u>tempus</u> to a state government's claims for indemnification or contribution against a private contractor.

public fisc," WMATA's cross-claim vindicates the type of "naked financial interest" that is not protected by nullum tempus. Owens-Corning, 572 A.2d at 406-407. Thus, because WMATA's cross-claim against Alstom does not enforce a public right, it does not fit the statute of repose's exception for claims brought by the District of Columbia government.

In sum, WMATA's cross-claim for contractual indemnity (Count I) falls under the statute of repose's exception for claims based on a contract, but its cross-claim for contribution (Count II) does not. And neither count of WMATA's cross-claim fits the statute of repose's exception for claims brought by the District. Accordingly, WMATA's motion to dismiss Alstom's statute of repose affirmative defense is granted in part and denied in part.

### III.  Ansaldo's motion for judgment on Counts 7, 11, and 15 of the plaintiffs' Second Amended Master Complaint[9]

This motion warrants only brief discussion. In their briefings, the parties agree to the dismissal of Count 14 (Negligent Train Traffic Control) of the plaintiffs' Second Amended Master Complaint because it is duplicative of Count 7. See ECF No. 390 at 1; ECF No. 394 at 1. The Court will therefore dismiss Count 14 of the Second Amended Master Complaint.

Ansaldo also moves for judgment on Count 11 (Breach of the Implied Warranty of Merchantability), and Count 15 (Breach of Warranty & Implied Warranty of Fitness for a Particular Purpose) of the Second Amended Master Complaint. The Court previously dismissed these counts as to Alstom, holding that "where a plaintiff alleges claims for both strict products liability and breach of implied warranties based on allegedly defective products against a party

---

[9] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) Ansaldo STS USA Inc.'s Motion for Judgment on Counts 7, 11, and 15 of the Second Amended Master Complaint [ECF No. 367]; (2) the Plaintiffs' Joint Opposition to Defendant Ansaldo's Motion for Judgment on Counts 7, 11, and 15 of the Second Amended Master Complaint [ECF No. 390] ; and (3) Ansaldo STS USA Inc.'s Reply in Support of its Motion for Judgment on Counts 11, 14, and 15 [ECF No. 394].

not in privity with the plaintiff, the implied warranty claims must be dismissed because the actions are the same." In re Fort Totten Metrorail Cases, 793 F. Supp. 2d 133, 152 (D.D.C. 2011).  In their opposition to Ansaldo's motion, the plaintiffs merely reincorporate the arguments that the Court previously rejected.  See ECF No. 390 at 2.  Accordingly, consistent with its prior ruling, the Court will dismiss Counts 11 and 15 of the Second Amended Master Complaint as to Ansaldo.

## IV.  WMATA's motion to dismiss the equitable indemnification cross-claims against it[10]

### A.    Introduction

In this motion, WMATA asserts that the corporate defendants' cross-claims against it for equitable indemnification must be dismissed because the interstate compact does not waive WMATA's sovereign immunity for equitable indemnification claims.  The Court agrees with WMATA and concludes that its motion must therefore be granted.

### B.    Background

The three corporate defendants, ARINC, Ansaldo, and Alstom, have all asserted cross-claims for equitable indemnification against WMATA.[11]  WMATA now moves to dismiss these

---

[10] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) the Memorandum in Support of Motion to Dismiss the Equitable Indemnification Cross-Claims Brought Against WMATA [ECF No. 424-1]; (2) the Joint Opposition by Defendants and Cross-Plaintiffs Alstom, Ansaldo and ARINC to WMATA's Motion to Dismiss the Equitable Indemnification Cross-Claims Brought Against WMATA [ECF No. 478]; and (3) the Reply Memorandum in Support of Motion to Dismiss Equitable Indemnification Cross-Claims Brought Against WMATA [ECF No. 548].

[11] Count II of Defendant ARINC, INC.'s Cross-Claim Against Defendant WMATA asserts: "Should plaintiffs recover damages against ARINC, the equities would require a shifting of responsibility from ARINC, whose product and actions did not contribute to or cause the injuries alleged, to WMATA, whose actions and omissions were directly responsible for the injuries alleged.  It is just and fair that, as between WMATA and ARINC, WMATA should bear the total responsibility of any losses recovered by Plaintiffs here."  ECF No. 139 ¶ 60.

Count II of the Crossclaim by Defendant Ansaldo Against Co-Defedants ARINC, Alstom, and WMATA asserts: "Ansaldo is entitled to equitable indemnification against WMATA for all costs, fees, and damages."  ECF No. 141 ¶ 28.
(continued . . . )

cross-claims for lack of subject matter jurisdiction under Rule 12(b)(1), arguing that the interstate compact's waiver of sovereign immunity is limited to liability for contractual breaches or tortious conduct occurring as a result of the performance of its non-governmental functions. WMATA asserts that because equitable indemnity is a distinct legal claim for which immunity was not waived, the corporate defendants' equitable indemnification claims are barred by sovereign immunity and must be dismissed for lack of subject matter jurisdiction.[12]   The cross-plaintiffs, however, maintain that equitable indemnity sounds in tort under District law and the cross-claims concern tortious conduct stemming from WMATA's proprietary functions. WMATA replies that the cross-plaintiffs' argument that their indemnity claims sound in tort blurs the lines between the parties and their respective positions in this litigation.

## C.     Analysis

### 1.     What is the nature of the cross-claims asserted against WMATA?

In addressing whether the corporate defendants' cross-claims against WMATA are barred by sovereign immunity, it is first necessary to explore the nature of an equitable indemnification claim.  "Although the right to indemnify may arise by contract, '[the District of Columbia Court of Appeals has] recognized that the obligation to indemnify may be implied in fact (on an implied contract theory) or implied in law in order to achieve an equitable result.'"  District of Columbia v. Wash. Hosp. Ctr., 722 A.2d 332, 340 (D.C. 1998) (quoting R. & G. Orthopedic

---

( . . . continued)
Count II of Defendant Alstom Signaling Inc.'s Cross-Claims Against Co-Defendants WMATA, Ansaldo and ARINC asserts: "[I]n the event [that] Alstom is held liable to Plaintiffs under any or all of the alleged claims in the Master Complaint, Alstom is entitled to equitable or common law indemnification from any and all cross-claim defendants for such damages and costs awarded Plaintiffs under any or all of their claims, as available under applicable law."  ECF No. 143 ¶ 26.

[12] "Sovereign immunity is a jurisdictional issue that may be raised at any time during the course of the litigation." Watters, 295 F.3d at 39 n.2.

Appliances v. Curtin, 596 A.2d 530, 544 (D.C. 1991)).  In such situations, "[a]n obligation to indemnify exists where the equities of the case and the relationship of the parties support shifting responsibility from one party to another."  Howard Univ. v. Good Food Servs., 608 A.2d 116, 122 (D.C. 1992); Quandrangle Dev. Corp. v. Otis Elevator Co., 748 A.2d 432, 434, n.2 (D.C. 2000) (noting the parties' concession that their contract "did not contain any express indemnification provision," and concluding that "[t]herefore, their claim is one of implied indemnification, based on equitable principles").  Stated differently, "[i]n the absence of an express contractual duty to indemnify, a right to indemnify exists where a duty to indemnify may be implied out of a relationship between the parties to prevent a result which is unjust."  Howard, 608 A.2d at 123; see also Johnson v. Mercedes-Benz, USA, LLC, 182 F. Supp. 2d 58, 65 (D.D.C. 2002) ("When based on equitable principles, indemnity may be granted to an indemnitee if there is a 'significant difference in the kind and quality' between the indemnitee's and the indemnitor's wrongdoing." (quoting Quandrangle Dev. Corp., 748 A.2d at 435)).

WMATA maintains that the "[c]ross-claimants' causes of action for indemnification against WMATA are expressly based on equity, and do not rely on a contract."  ECF No. 424-1 at 5.  The corporate defendants disagree, claiming that "equitable indemnity sounds in tort under controlling D.C. law."  ECF No. 478 at 1.  The corporate defendants are incorrect.  Equitable indemnification is premised on "the equities of the case and the relationship of the parties."  Howard Univ., 608 A.2d at 122.  While the corporate defendants may be correct that determining the equities in a given case will often require an examination of the "kind and quality," Quandrangle Dev. Corp., 748 A.2d at 435, of the tortious conduct at issue, this does not mean that equitable indemnification sounds in tort.  Rather, this examination of the tortious conduct provides the basis from which to assess the equities.  Thus, although "the [c]ross-plaintiffs'

equitable indemnification cross-claims <u>concern</u> WMATA's [allegedly] tortious misconduct," ECF No. 478 at 10 (emphasis added), they are not tort claims.  The cross-plaintiffs' equitable indemnification claims are based on equitable principles—not tort or contract law.

**2.      Has WMATA waived its sovereign immunity as to equitable indemnification claims?**

WMATA asserts that "[t]he cross-claimants cannot show the existence or applicability of any waiver of sovereign immunity that would make WMATA amenable to suit for implied indemnification."  ECF No. 424-1 at 7.  The Court agrees.

"In signing the WMATA Compact, Maryland, Virginia, and the District of Columbia conferred upon WMATA their respective sovereign immunities."  <u>Beebe v. WMATA</u>, 129 F.3d 1283, 1287 (D.C. Cir. 1997).  "Although [section 12(a) of] the WMATA Compact provides that WMATA may '[s]ue and be sued,' [the Circuit has] held that provision to extend only as far as the more specific (and partial) waiver of sovereign immunity contained in section 80 of the Compact."  <u>Watters</u>, 295 F.3d at 40.  In relevant part, Section 80 of the interstate compact provides:

> The Authority shall be liable <u>for its contracts and for its torts</u> and those of its Directors, officers, employees and agent[s] committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function.

D.C. Code § 9-1107.01(80) (emphasis added).

"Waivers [of sovereign immunity] must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires."  <u>Kingston Constructors, Inc. v. WMATA</u>, 860 F. Supp. 886, 888-89 (D.D.C. 1994) (citing <u>Library of Congress v. Shaw</u>, 478 U.S. 310, 317, 318 (1986)).  "'There can be no consent by implication or by use of ambiguous language . . . .

The consent necessary to waive [sovereign] immunity must be express, and it must be strictly construed.'" Id. (quoting Shaw, 478 U.S. at 318); see also Watters, 295 F.3d at 40 ("We may find a waiver of sovereign immunity 'only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.'" (quoting Morris v. WMATA, 781 F.2d 218, 221 (D.C. Cir 1986))).

Although there appear to be no cases dealing specifically with whether the WMATA compact waives sovereign immunity for equitable indemnification claims, courts have concluded that the compact does not waive sovereign immunity for other equitable remedies.  For example, in Martin v. WMATA, 273 F. Supp. 2d 114 (D.D.C. 2003), another judge of this Court held that WMATA was immune from the plaintiff's promissory estoppel claim.  See id. at 119 ("Section 80's waiver only denotes WMATA's liability for its contracts and torts occurring in the performance of a non-governmental function; it does not mention promissory estoppel, which is a distinct legal theory.").  And in Watters, the Circuit determined that an attorney's lien was not a contract with, or tort of, WMATA.  295 F.3d at 40.  The court explained that "such a lien is an equitable device," and is "merely a claim to equitable interference by the court to have [a] judgment or settlement held as security."  Id. at 41 (internal quotation marks and citation omitted).  Most recently, the United States District Court for the District of Maryland held that because "WMATA has not explicitly waived its immunity as to quasi-contract claims [such as equitable estoppel], [it was] entitled to assert its sovereign immunity defense as to [the p]laintiff's Statute of Frauds claim."  Greenbelt Ventures, LLC v. WMATA, No. 10-cv-157, 2011 WL 2175209, at *6 (D. Md. June 2, 2011).

In light of the need to strictly construe the WMATA compact's waiver, which only expressly waives WMATA's sovereign immunity for contracts and proprietary-function torts,

and considering the foregoing case law finding WMATA immune from other forms of equitable claims, the Court concludes that WMATA has not waived its sovereign immunity as to equitable indemnification claims.  Accordingly, WMATA's motion to dismiss is granted, and the corporate defendants' claims for equitable indemnification are dismissed for lack of subject matter of jurisdiction.

## V.   The corporate defendants' joint motion for summary judgment on all claims[13]

### A.   Introduction

The corporate defendants jointly move for summary judgment on the ground that WMATA's alleged negligence constitutes a superseding cause that severed the causal connection between the corporate defendants' purported negligence and the June 22, 2009 train collision. Because this case does not present the type of "exceptional circumstances" necessary to remove issues of causation from the jury, the Court will deny the corporate defendants' motion.

### B.   Background[14]

#### 1.   Overview of WMATA's Metrorail System

A brief overview of two components—track circuits and the Advanced Information Management software—that play a part in WMATA's operation of the Metrorail system is necessary to resolve the corporate defendants' motion.  First, to operate the Metrorail system,

---

[13] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) Defendants Alstom, Ansaldo and ARINC's Memorandum of Points and Authorities in Support of their Joint Motion for Summary Judgment on All of the Plaintiffs' Claims [ECF No. 425-1]; (2) Defendant WMATA's Memorandum in Opposition to the Co-Defendants' Joint Motion for Summary Judgment [ECF No. 483]; (3) the Plaintiffs' Opposition to Defendants Alstom, Ansaldo and ARINC's Joint Motion for Summary Judgment [ECF No. 487]; and (4) Defendants Alstom, Ansaldo, and ARINC's Reply in Support of their Joint Motion for Summary Judgment on All of Plaintiffs' Claims [ECF No. 549].

[14] The following facts are undisputed unless otherwise noted.

"WMATA uses an [Automatic Train Control] system that consists of a series of track circuits (or

'blocks'), each with an electronic transmitter [module], receiver [module], vital relay, and

impedance bonds."  ECF No. 425-1 at 2.   Each circuit has two impedance bonds.  ECF No. 483

at 3.  As the corporate defendants explain (and WMATA does not dispute):

> The system works by the transmitter sending an audio frequency signal through a
> cable to the impedance bond at one end of the block. When no train is present, the
> signal runs along the rails to the impedance bond at the other end of the block
> where it travels through a cable to the receiver, thereby completing the electrical
> circuit. If the circuit is completed, the relay is energized and the block reports as
> unoccupied. If a train is present, however, the train's metal wheels and axles
> "short" or "shunt" the signal before it reaches the impedance bond at the receiver
> end of the block, causing an interruption of the circuit that de-energizes the relay.
> De-energizing of the relay indicates that a train occupies the particular block and
> allows the appropriate information to be conveyed to oncoming trains in the
> WMATA Metrorail system.

ECF No. 425-1 at 2-3.  A "bobbing" circuit is one in which the relay signal "fluctuates between

an energized (indicating [a] vacant [circuit]) to a de-energized state (indicating [an] occupied

[circuit]) regardless of whether a train is actually present in the track circuit."  Id. at 4.  A

phenomenon known as "parasitic oscillation" occurs when the transmitter module bypasses the

impedance bonds and sends a signal directly to the receiver module.  In other words, parasitic

oscillation is when the modules ignore the other components of the circuit and therefore convey

information that is not based on the whole circuit.

Second, WMATA's Operations Central Control uses a software program called

Advanced Information Management, which was developed by ARINC.  ECF No. 483 at 15.  The

software generates alarms associated with bobbing circuits, false occupancies (i.e., always

reporting blocks), and false vacancies (i.e., never reporting blocks).  Id.; see also ECF No. 425-1

at 9 ("A 'track circuit failed vacant' alarm means that the track circuit is reporting a vacancy

when, in fact, the track circuit may actually be occupied.").  The software designates a false

vacancy as "minor," which means the alarm is self-acknowledging and self-deleting (i.e., that they do not require operator attention or intervention).  ECF No. 483 at 15.

    2.    **Activity at Circuit B2-304 from June 17, 2009, until June 22, 2009**

The WMATA track circuit located at the site of the collision that resulted in this litigation is Circuit B2-304.  At the time of the collision on June 22, 2009, Circuit B2-304 consisted of Alstom transmitter/receiver modules and Ansaldo impedance bonds.  Id. at 3.

On June 17, 2009, WMATA replaced an Alstom impedance bond at Circuit B2-304 with an Ansaldo impedance bond.  ECF No. 425-1 at 4.  WMATA protocol calls for a "shunt verification test" after the installation of an impedance bond.  Id.  The test is conducted by laying a shunt strap between the rails.  ECF No. 483 at 4.  If the relay detects the presence of the shunt strap and interprets it as a train, the circuit is considered to have passed the shunt verification test.  Id.  The leader of the WMATA work crew that installed the impedance bond at Circuit B2-304 on June 17, 2009, has testified that she did not observe bobbing when the shunt verification test was being conducted, but stated that she observed that the circuit was bobbing after she completed the shunt verification test.  Id. at 10.

After the WMATA work crew left the site, WMATA's Maintenance Operations Center opened a work order for the bobbing at Circuit B2-304.  ECF No. 425-1 at 7.  Despite the work order, and visits by different work crews to Circuit B2-304 on June 18, 19, and 22, 2009, Circuit B2-304 was still bobbing when the collision occurred on June 22, 2009.  Id. at 7-8.  And, no one at WMATA had instituted an "absolute block"—closing down specific locations of track into which no train would be permitted to enter—while Circuit B2-304 was bobbing.

3.        **The Advanced Information Management System Alarms**

Between June 17 and 22, 2009, the Advanced Information Management system generated "hundreds and hundreds" of "track circuit failed vacant" alarms on the Red Line in the area between the Takoma and the Fort Totten Metrorail stations.  ECF No. 425-1 at 9.  In the hour before the June 22, 2009 collision, the Advanced Information Management system generated seventeen separate "track circuit failed vacant" alarms.  Id.  Indeed, two minutes before the collision, while the train that was struck was stopped between the Takoma and Fort Totten stations, the system generated a "track circuit failed vacant" alarm for that area of the track.  Id. at 9-10.  WMATA did not have a protocol at its Operations Central Control for responding to a failed vacant alarm, and neither controller on duty at the time of the collision instituted an absolute block in response to the failed vacant alarm.  Id. at 10.

C.        **The Parties' Arguments**

In moving for summary judgment, the corporate defendants maintain that "[t]he key undisputed fact is that WMATA placed a known, malfunctioning track circuit in service, contrary to its own policies."  ECF No.425-1 at 11.  The corporate defendants further assert that "[e]ven if the Court found Alstom, Ansaldo, or ARINC's equipment to be defective, or that there was a lack of safety testing, WMATA's reckless actions were the superseding cause of the accident, thereby relieving Alstom, Ansaldo, and ARINC of all liability as a matter of law."  Id. at 12.  WMATA and the plaintiffs disagree.  Specifically, WMATA argues that it viewed bobbing track circuits as a maintenance, rather than a safety, issue, ECF No. 483 at 2, and that its work crews were consequently unaware of the actual hazard at Circuit B2-304.  Accordingly, WMATA asserts that there are questions of fact "about whether WMATA responded in a manner that was reasonable and foreseeable under the circumstances."  Id.  The plaintiffs assert that from

26

each of the corporate defendants' "particular positions," "it was foreseeable that WMATA might fail to remediate [the corporate defendants'] negligence." ECF No. 487 at 7-8. As a result, the plaintiffs maintain, WMATA's negligence does not absolve the corporate defendants of liability. Id.

**D.      Analysis**

>   **1.      Can the Court conclude that, as a matter of law, WMATA's negligence was a superseding or intervening cause that precludes the corporate defendants' liability?**

"Proximate cause has been defined as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." Convit v. Wilson, 980 A.2d 1104, 1125 (D.C. 2009). "Superseding cause is a subset of the inquiry into proximate cause," id. at 1125-26, and essentially it is "a concept that the action of a subsequent tortfeasor may be a superseding cause which breaks the chain of causation and relieves the first tortfeasor of liability to the injured party," id. at 1126. "The question of proximate causation . . . is at base one of foreseeability." Rieser v. District of Columbia, 563 F.2d 462, 479 (D.C. Cir. 1977). "If a negligent, intentional or even criminal intervening act or end result was reasonably foreseeable to the original actor, his liability will not ordinarily be superseded by that intervening act." Id.

As even the corporate defendants acknowledge, proximate causation is ordinarily a question of fact for the jury. See ECF No.425-1 at 22. Indeed, the cases are legion holding that it is only the "exceptional case" in which questions of proximate cause "pass from the realm of fact to one of law." Majeska v. District of Columbia, 812 A.2d 948, 950 (D.C. 2002) (emphasis added); accord Rieser, 563 F.2d at 480 ("Proximate causation, including the question of

superseding cause, . . . is ordinarily a question of fact for the jury."); Smith v. Hope Village, Inc., 481 F. Supp. 2d 172, 185 (D.D.C. 2007) (Walton, J) (citing cases).

This case is not so exceptional as to warrant removing the determination of causation from the jury.  Compare, for example, the facts of this case to that in In re Korean Air Lines Disaster, No. 83-cv-0345, 1985 WL 9447 (D.D.C. Aug. 2, 1985), which the corporate defendants cite in support of their motion.  In Korean Air, a jet owned and operated by Korean Air Lines inadvertently veered into the airspace of the Soviet Union and was intentionally shot down by Soviet missile attack.  Id. at *1.  The parties had conceded defects in the plane's navigational systems, and the sole question before the court was the foreseeability of the Soviet Union's actions.  Id.  The Court ruled that the defendants, manufacturers of the plane's navigational systems, could not "be held liable for the unexpected act of aggression by the Soviet Union."  Id. at *7.

Here, in contrast to the Soviet Union's deliberate launching of missiles in In re Korean Air, WMATA's alleged superseding acts were merely negligent, not intentional.  Such negligent acts are not so unforeseeable that the corporate defendants can be absolved of liability as a matter of law.  On the contrary, a reasonable jury could conclude that the corporate defendants should have foreseen that WMATA would fail to take action on a work order for five days, despite WMATA's own policies to respond to a work order, carry out the task it involves, and close the order within one business day of completion of the work.  See ECF No. 425-1 at 7.  A reasonable jury could also conclude that the corporate defendants—specifically, ARINC—should have foreseen that WMATA would ignore the "track circuit failed vacant alarms" in the days, hours, and minutes preceding the collision.  Accordingly, because this is not a case where the proximate cause determination should "pass from the realm of fact to one of law," Majeska, 812 A.2d at

950, the corporate defendants' motion for summary judgment on all claims and cross-claims against them is denied.

## VI.   <u>Ansaldo's Motion for Summary Judgment</u>[15]

### A.   Introduction

Ansaldo moves for summary judgment as to all claims on the following grounds: (1) it is entitled to derivative sovereign immunity because all of the claims against it stem from WMATA's "immune decision" to sequence the installation of Ansaldo's impedance bonds and modules; (2) there is no evidence that Ansaldo's impedance bonds and Alstom's modules were incompatible; (3) the failure to warn claims against Ansaldo fail because (a) there is no duty to warn about another manufacturer's (i.e., Alstom) products, and (b) WMATA is a "sophisticated user" to which Ansaldo owed no duty to warn; and (4) the derivative counts of wrongful death and survival must be dismissed if the underlying counts are dismissed.

The Court concludes that (1) Ansaldo's attempt to invoke derivative sovereign immunity fails as a matter of law because the claims against it do not relate to any "immune" decisions made by WMATA; instead, the claims assert that Ansaldo breached its contractual obligations to WMATA and that Ansaldo performed under the contract negligently; (2) Ansaldo's argument that there is no evidence of incompatibility is essentially a causation issue that must be decided by a jury; (3) Ansaldo did have a legal duty to warn WMATA; and (4) the derivative counts

---

[15] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) Ansaldo STS USA, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment [ECF No. 426-1]; (2) Defendant WMATA's Memorandum in Opposition to Defendant Ansaldo STS USA, Inc.'s Motion for Summary Judgment [ECF No. 480]; (3) Defendant Alstom Signaling Inc.'s Opposition to Ansaldo STS USA, Inc.'s Motion for Summary Judgment [ECF No. 481]; (4) the Plaintiffs' Opposition to Defendant Ansaldo STS USA, Inc.'s Motion for Summary Judgment [ECF No. 482]; and (5) Ansaldo STS USA, Inc.'s Reply to the Opposition Briefs Submitted by Plaintiffs, Washington Metropolitan Transit Authority, and Alstom Signaling, Inc. to Ansaldo's Motion for Summary Judgment [ECF No. 550].

should not be dismissed because the underlying counts remain.  Accordingly, the Court denies

Ansaldo's motion in its entirety.

**B.      Background**

As explained above, WMATA employs an "automatic train control system" to ensure

safe train detection, separation, and speed restrictions.  ECF No. 480 at 3.  This system is

comprised of "track circuits," which are railroad segments of varying lengths.  Id.  Two

impedance bonds are located on each track circuit.  Id.  The impedance bonds communicate via

transmitters and receivers called "modules," which are located at the nearest station in an

unmanned train control room.  Id.

Communication between the impedance bonds and the modules is accomplished by

transmitter and receiver modules that exchange audio-frequency signals.  Id.  A train's presence

on the track is sensed when its wheels and axles cause a short between the rails.  Id.  This is

known as a "shunt."  Id.  A "shunt" causes a vital relay, which is connected to the modules, to

de-energize or "drop."  Id.  Otherwise, the relay remains energized, or "picked," when a track

circuit is actually vacant.  Id.

Alstom designed WMATA's original automatic train control system in the 1970s,

including its impedance bonds and modules.  Id. at 3-4.  Beginning in 2002, WMATA contracted

with Ansaldo to replace the Alstom impedance bonds and modules with Ansaldo products.  Id. at

4.  Two separate contracts were executed by the parties.  ECF No. 426-1 at 15.  Under the first

contract, Ansaldo was originally required to replace the impedance bonds and modules

simultaneously.  Id.  However, due to safety concerns about non-WMATA personnel working on

the tracks, WMATA altered the replacement process as follows: first, only WMATA employees

would replace the impedance bonds; second, WMATA employees would conduct a safety test of

the track circuit; and third, Ansaldo employees would replace the <u>modules</u> and conduct another safety test of the track circuit.  <u>Id.</u> at 15; ECF No. 480 at 5.  This change in the replacement project resulted in a temporarily "mixed track circuit" consisting of the old Alstom modules and the new Ansaldo impedance bonds.  ECF No. 480 at 5.

The second contract, which covered track circuit replacements at 22 locations throughout WMATA's system, reflected this "temporary mixed track circuit configuration."  <u>Id.</u> Specifically, the contract provided that "WMATA personnel will perform all wayside installation [of the Ansaldo] impedance bonds," and that Ansaldo "will replace [the Alstom] . . . modules [with Ansaldo modules] <u>after</u> the associated wayside equipment has been installed."  ECF No. 480-9 (Contract No. F05143) § 1.01.C (emphasis added).  Recognizing that, as a result of this revised replacement process, "[n]ew impedance bonds will temporarily be in service with existing [Alstom]  . . . modules," the contract directed that the Ansaldo "impedance bonds being provided on this Contract <u>must</u> be compatible with the existing [Alstom] . . . modules."  <u>Id.</u> (emphasis added).  The contract also required Ansaldo to provide a "Hazard Mode and Effect Analysis, which, as a minimum, identifies one example of each hazard that may be produced by each possible failure in [Ansaldo's] equipment and software."  <u>Id.</u> § 1.06.  Finally, the contract provided that "[t]he system shall be proven by [Ansaldo] to be fail safe and operational upon completion of the installation."  <u>Id.</u> § 1.01.A.  In the context of a public transit railroad, the term "fail safe" means that "if a vital component fails, the system will automatically revert to a less permissive state which restricts the movement of trains."  ECF No. 480-1 at 2.

According to WMATA, despite Ansaldo's "contractual requirement to provide compatible equipment," Ansaldo "took no actions whatsoever to evaluate the safety of using its [impedance] bonds with Alstom's modules."  ECF No. 480 at 7-8.  WMATA further claims that

prior to the June 22, 2009 Fort Totten train collision, Ansaldo became aware of specific
compatibility problems with the Ansaldo impedance bonds and Alstom modules, but did nothing
to address them.  See id. at 8-9.

The track circuit at issue in this case, Circuit B2-304, contained a mixed configuration of
Ansaldo impedance bonds and Alstom modules when the accident occurred.  Id. at 9.  In seeking
to explain the cause of the June 22, 2009 train collision, WMATA contends that a latent defect in
the automatic train control system known as "parasitic oscillation" caused a signal to be
transmitted which falsely indicated that Circuit B2-304 was vacant.  Id. at 2-3.  This, in turn, led
Train No. 112 to crash into Train No. 214.  Id.  WMATA argues that power increases required
by the installation of the new Ansaldo impedance bonds "created the conditions necessary for the
parasitic oscillation to pass through the rack structure, couple to the receiver, and mimic the track
vacant signal."  Id. at 13.

**C.      Analysis**

**1.      Is Ansaldo entitled to derivative sovereign immunity under <u>Yearsley v. W.A.</u>**
**<u>Ross Construction Co.</u>, 309 U.S. 18 (1940)?**

Ansaldo asserts that all of the claims and cross-claims against it "stem from WMATA's
decision to sequence the timing of bond and module installation," which led to track circuits
temporarily consisting of Ansaldo impedance bonds and Alstom modules, and that this decision
of WMATA is protected by sovereign immunity.  ECF No. 426-1 at 14.  Ansaldo further
contends that because it "followed WMATA's safety and scheduling directions, as required by
its contract with WMATA," it is entitled to "derivative sovereign immunity" under <u>Yearsley v.</u>
<u>W.A. Ross Construction Co.</u>, 309 U.S. 18 (1940), and its progeny.  Id. at 14-15.

In Yearsley, the Supreme Court considered whether a contractor that built dikes in the Missouri River pursuant to a contract with the federal government could be held liable for damage caused by the construction of the dikes.  See 309 U.S. at 19-20.  The contract was part of a federal project "authorized by an Act of Congress."  Id. at 19.  The Court concluded that the contractor could not be held liable, reasoning that when the "authority to carry out [a] project [is] validly conferred, that is, [when] what [is] done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing [Congress's] will."  Id. at 20-21.  The Court observed, however, that "[w]here an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred."  Id. at 21.

Federal courts have construed Yearsley as creating the so-called "doctrine of derivative sovereign immunity."  McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1343 (11th Cir. 2007).  To claim such immunity, a private contractor generally must show that (1) it "was working pursuant to the authorization and direction of the federal government," and (2) "the acts of which the plaintiff complained fell within the scope of those government directives."  In re World Trade Center Disaster Site Litig., 521 F.3d 169, 196 (2d. Cir. 2008) (citing Yearsley, 309 U.S. at 20-21).

Several initial hurdles impede Ansaldo's efforts to invoke the Yearsley doctrine in this case.  First, no court in this Circuit has applied the doctrine.  Second, the Circuits that have applied it are not in consensus regarding the doctrine's requirements.[16]  Third, because it is a

_____

[16] For example, the Circuits disagree as to whether the contractor must show a common law agency relationship with the government to avail itself of derivative sovereign immunity.  Compare McMahon, 502 F.3d at 1343 ("[T]he (continued . . . )

federal common law doctrine, Yearsley has been almost exclusively applied in cases involving federal government contractors (as was the case in Yearsley itself), and the question of whether WMATA can be deemed a federal agency is unresolved.  See Elcon Enterp. v. WMATA, 977 F.2d 1472, 1480 (D.C. Cir. 1992) (declining to resolve the issue).  One could plausibly argue, then, that the Yearsley doctrine does not apply to WMATA's contractors because they do not contract directly with the federal government.  Nevertheless, even assuming that all of these preliminary issues are resolved in Ansaldo's favor, the Court finds that it is not entitled to derivative sovereign immunity under Yearsley for the following reasons.

The Yearsley doctrine is subject to two important limitations.  First, "a key premise of Yearsley, and one that has been reiterated by [various federal courts] is that the contractor was following the sovereign's directives."  Chesney v. Tenn. Valley Auth., 782 F. Supp. 2d 570, 582 (E.D. Tenn. 2011) (citing, among others, Yearsley, 309 U.S. at 20-21).  "While Yearsley established that a private corporation performing governmental functions pursuant to contractually delegated authority will not be liable in tort to third parties, it also acknowledged that an agent or officer of the Government purporting to act on its behalf, but in actuality exceeding his authority, shall be liable for his conduct causing injury to another."  In re KBR, Inc., 736 F. Supp. 2d 954, 967 (D. Md. 2010) (citing Yearsley, 309 U.S. at 21; accord Myers v.

_____

( . . . continued)
entity claiming the immunity must at a bare minimum have been a common law agent of the government at the time of the conduct underlying the lawsuit."), and In re Hanford Nuclear Reservation Litig., 534 F.3d 986, 1001 (9th Cir. 2008) ("The [Yearsley] Court limited the applicability of the defense to principal-agent relationships where the agent had no discretion in the design process and completely followed government specifications."), with Ackerson v. Bean Dredging LLC, 589 F.3d 196, 205-206 (5th Cir. 2009) ("The Supreme Court's decision in Yearsley does not require a public-works contractor defendant to establish a traditional agency relationship with the government."), and Butters v. Vance Intern., Inc., 225 F.3d 462, 466 (4th Cir. 2000) (citing Yearsley for the principle that "contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity" (emphasis added)).

United States, 323 F.2d 580, 583 (9th Cir. 1963) ("To the extent that the work performed by [the federal contractor defendant] was done under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the appellants." (citing Yearsley, 309 U.S. at 18) (emphasis added)).  Second, derivative sovereign immunity is not available to contractors who act negligently in performing their obligations under the contract.  See Ackerson, 589 F.3d at 207 (indicating that a contractor that commits a "separate act of negligence" is not entitled to derivative sovereign immunity under Yearsley); City of Worcester v. HCA Mgmt. Co., 753 F. Supp. 31, 38 (D. Mass. 1990) (Yearsley does not apply "when a private corporation who performs governmental duties pursuant to contractual authority from the government is sued for negligence in the performance of these duties.").

In assessing whether Ansaldo is entitled to derivative sovereign immunity under the foregoing principles, it is first necessary to identify the conduct of Ansaldo that is being challenged by the plaintiffs and cross-plaintiffs (WMATA and Alstom).  The parties, not surprisingly, disagree as to what that conduct is.  According to Ansaldo, all of the claims and cross-claims against it arise from WMATA's "safety and scheduling decision to sequence the installation of bonds and modules," a decision which Ansaldo claims is protected by sovereign immunity.  ECF No. 550 at 1.  The plaintiffs and cross-plaintiffs, on the other hand, argue that the claims against Ansaldo are predicated not on WMATA's decision to sequence the installation of the impedance bonds and modules, but rather on Ansaldo's breach of its contractual obligations and its negligence in performing those obligations.  See ECF No. 480 at 18; ECF No. 481 at 11; ECF No. 482 at 33-35.  The Court agrees with the plaintiffs and cross-plaintiffs.

Ansaldo's derivative sovereign immunity argument mischaracterizes the nature of the claims and cross-claims being asserted against it.  As previously noted, the operative contract between Ansaldo and WMATA required Ansaldo to ensure that its impedance bonds were "compatible" with the existing Alstom modules, in recognition of the fact that the "[n]ew impedance bonds will temporarily be in service with existing [Alstom] . . . modules."  ECF No. 480-9 (Contract No. F05143) § 1.01.C.  The contract also required Ansaldo to perform a Hazard Modes and Effects Analysis and safety testing on the track circuit to ensure that it was "fail safe."  See id. §§ 1.06, 1.01.A.  The plaintiffs assert that Ansaldo negligently failed to perform safety and compatibility testing in violation of its contractual obligations and applicable standards of care, and that Ansaldo failed to warn WMATA about various issues related to the mixing of the Ansaldo and Alstom products.  See ECF No. 482 at 1-2.  Similarly, WMATA's cross-claim asserts that Ansaldo breached its contractual obligations to WMATA and acted negligently by failing to ensure the compatibility of the Ansaldo and Alstom products, and by failing to perform the requisite safety testing.  See ECF No. 480 at 18.  Thus, the very premise of these claims is that Ansaldo acted against the "will of the sovereign" by breaching its contractual duties to WMATA and by performing negligently under the contract.[17]  Derivative sovereign immunity under Yearsley does not shield such claims.  See Yearsley, 309 U.S. at 20-21; Ackerson, 589 F.3d at 207; Myers, 323 F.2d at 583; City of Worcester, 753 F. Supp. at 38.

---

[17] To be clear, although WMATA and the plaintiffs allege that Ansaldo breached its contractual obligations, they do not appear to assert breach of contract claims against Ansaldo.  Instead, they rely upon Ansaldo's purported breach of contract in support of their negligence claims.  See, e.g., ECF No. 140 ¶ 93 ("If WMATA is found liable to the [p]laintiffs, WMATA submits that Ansaldo's . . . negligent . . . performance of the duties it assumed under Contract No. F05143/EAC . . . [was a] direct contributing and proximate cause[] of such liability.").

Indeed, the fact that WMATA, the purportedly sovereign entity, is seeking to impose liability upon Ansaldo undermines its attempt to invoke derivative immunity.

Ansaldo nonetheless maintains that all of its alleged liability in this case flows from WMATA's "immune decision" to sequence the replacement of the impedance bonds and modules, noting that "[]Ansaldo would not be in this case if WMATA had not made the protected decision to use []Ansaldo bonds for a short period of time with the defective []Alstom modules." ECF No. 550 at 2-3. This argument confuses the issues. True, it was WMATA's decision to temporarily use Ansaldo impedance bonds and Alstom modules on the same track circuit. But after WMATA made that decision, the plaintiffs and WMATA contend that Ansaldo contractually guaranteed that those two products would be "compatible" and that it would conduct certain tests to ensure their safe operation. The claims against Ansaldo alleging that it acted negligently in performing its contractual obligations thus do not challenge WMATA's purportedly "immune decision," but instead concern Ansaldo's voluntary conduct after that decision was made. Consequently, Ansaldo is not entitled to derivative sovereign immunity under Yearsley as to these claims.

> **2.      Can Ansaldo be held liable for the alleged incompatibility between its impedance bonds and Alstom's track circuit modules?**
>
> > **i.      Is there evidence from which a reasonable jury could infer that the alleged incompatibility played a role in causing the collision?**

Ansaldo argues that summary judgment should be granted in its favor because "[n]on-defective [Alstom] track circuit modules are compatible with [Ansaldo] impedance bonds" and because "lack of 'compatibility' did not cause the crash." ECF No. 426-1 at 23. Ansaldo continues: "Nothing . . . is compatible with a dangerous, oscillating track circuit module and no impedance bond can ever mitigate the dangers associated with track circuit modules that break

into parasitic oscillations." Id. Ansaldo thus strenuously maintains that "compatibility issues were not the cause of the accident." Id. There is sufficient evidence, however, from which a reasonable jury could conclude that, even if the parasitic oscillation was the sole cause of the June 22, 2009 collision, Ansaldo's bonds contributed to the oscillation.

For example, as noted above, WMATA argues that power increases required by the installation of the new Ansaldo impedance bonds "created the conditions necessary for the parasitic oscillation to pass through the rack structure, couple to the receiver, and mimic the track vacant signal." ECF No. 480 at 13; see also id. at 36 ("The need to increase power levels when Ansaldo bonds were installed is a significant factor in explaining how the incompatibility of the Ansaldo equipment contributed to the loss of train detection at [Circuit] B2-304."). Indeed, one of Alstom's expert witnesses, Dr. Duncan Glover, has provided testimony on the "many electrical differences between" the Alstom bonds that were replaced with the Ansaldo bonds, and has explained that one of these differences—bondline impedance—is "important because the lower impedance of the Ansaldo bond draws more current from the module, which in turn makes the transistors within the module more likely to oscillate." ECF No. 481 at 4; see also ECF No. 481-1 ¶ 247 ("Q. Will a lower impedance make a transistor work harder? A. For the same power level setting? Q. Yes. A. If the power level . . . setting were the same and the impedance looking into the bond were lower, it would require more current to achieve the same voltage level. . . . [H]igher currents could make those parasitics have a higher magnitude."). There is thus a dispute of fact as to whether Ansaldo's impedance bonds played a role in the parasitic oscillation that Andsaldo vigorously claims was the sole cause of the collision. While Ansaldo may attempt to frame the issue in terms of questioning whether there is sufficient evidence of compatibility, see ECF No. 426-1 at 22, 24, Ansaldo's compatibility arguments are nothing more

38

than claims that their bonds played no part in <u>causing</u> the collision.  And, as has been set forth

earlier in this Memorandum Opinion, it is only the "<u>exceptional</u> case" in which questions of

proximate cause "pass from the realm of fact to one of law."  <u>Majeska</u>, 812 A.2d at 950

(emphasis added).

> **ii.      Is there evidence from which a reasonable jury could conclude that
> Ansaldo's conduct breached a duty of care?**

Ansaldo maintains that even if there is evidence of incompatibility, the claims relating to

that incompatibility must fail because Ansaldo's expert is the only expert in the case to have

cited "any industry recognized definition relating to the compatibility of track circuit

equipment."  ECF No. 426-1 at 26.  That expert, of course, testified that Ansaldo breached no

duty of care regarding compatibility.  <u>See, e.g.</u>, ECF No. 426-2 ¶¶ 156-57 (describing the

testimony of Professor Mark Horenstein).

"The plaintiff in a negligence action bears the burden of proof on three issues: 'the

applicable standard of care, a deviation from that standard by the defendant, and a causal

relationship between that deviation and the plaintiff's injury.'"  <u>Toy v. District of Columbia</u>, 549

A.2d 1, 6 (D.C. 1988) (quoting <u>Meek v. Shepard</u>, 484 A.2d 579, 581 (D.C. 1984)).  "Thus, at the

outset, to establish a prima facie negligence case, the plaintiff must prove that the defendant

deviated from the applicable standard of care."  <u>Toy</u>, 549 A.2d at 6.  From these legal

requirements, Ansaldo asserts that "the definition of 'compatible,' and the appropriate standard

for compatibility testing, are matters that must be established by expert testimony."  ECF No.

426-1 at 28.  This, however, puts too fine a point on the standard of care burden of proof.  For

example, in <u>Caldwell v. Bechtel</u>, 631 F.2d 989 (D.C. Cir. 1980), the court explained that "the

analysis of both [the appellee] and the district court is overly reliant upon contract theory to the

point of losing focus of the nature of the claim made here, which asserts negligence, rather than breach of contract." Id. at 996-97.  In Bechtel, the plaintiff was a worker who had contracted a lung condition while working in the construction of a Metrorail tunnel.  WMATA had contracted with Bechtel, a consultant, to ensure safe working conditions during the course of construction.  The Circuit assessed "whether the contractual authority vested in Bechtel with respect to job site safety regulations created a special relationship between Bechtel and [the plaintiff/appellant] under with Bechtel owed a duty to take reasonable steps to protect him from foreseeable risk." Id. at 993.  Bechtel asserted it owed the duty only to WMATA, not to the actual workers, an argument rejected by the Circuit:

> The duties that Bechtel undertook in its contract with WMATA are relevant to this case, not because they illustrate Bechtel's point that a contractual duty was owed only to WMATA, but because by assuming a contractual duty to WMATA, Bechtel placed itself in the position of assuming a duty to appellant in tort.  The particular circumstances of this case, including the Bechtel-WMATA contract, Becthel's superior skills and position, and Bechtel's resultant ability to foresee the harm that might reasonably be expected to befall appellant, created a duty to take reasonable steps to prevent harm to appellant.

Id. at 997; see also Long v. District of Columbia, 820 F.2d 409, 418 (D.C. Cir. 1988) ("Like Bechtel, PEPCO entered into a contract to perform services within its field of expertise; PEPCO thereby acquired a duty to foreseeable plaintiffs (in this case, members of the travelling public) to perform these services with reasonable care.")

As in Bechtel, the Ansaldo-WMATA contract supplies only the basis of the duty of care and does not determine the standard of care required by that duty.  In other words, while the compatibility of the circuit parts is relevant, the more pressing inquiry is how Ansaldo undertook and fulfilled its contractual duties, including, but not limited to, its assessment of compatibility.  Although expert testimony may be required in a breach of contract action to ascertain the

40

meaning of compatibility between track circuit parts, the expert testimony here concerns the

standard of care resulting from the tort duty owed by Ansaldo to WMATA.  And WMATA,

Ansaldo, and the plaintiffs have all provided expert testimony as to the safety analyses that

should have been employed by Ansaldo.  See ECF No. 480 at 29; ECF No. 482 at 38.

Accordingly, the Court rejects Ansaldo's argument that evidence regarding the applicable

standard of care is lacking.

### 3. Does the failure to warn claim against Ansaldo fail as a matter of law?

#### i. Did Ansaldo have a duty to warn?

"The threshold question in a failure-to-warn case is 'whether a duty to warn exists.'"

McNeal v. Hi-Lo Powered Scaffolding, Inc., 836 F.2d 637, 641 (D.C. Cir. 1988) (quoting Hull v.

Eaton Corp., 825 F.2d 448, 454 (D.C. Cir. 1987)).  "In the District of Columbia that

determination turns on whether the manufacturer knew or should have known of a danger

sufficiently serious to require a warning."  McNeal, 836 F.2d at 641 (internal quotation marks

and citation omitted).  "A plaintiff need not show that there was a manufacturing defect in order

to recover: a product can be perfectly made and still require directions or warnings on proper use

in order to be safe."  Id. (internal quotation marks and citation omitted).  "[P]revious decisions

[of the District of Columbia Court of Appeals] indicate that fact-intensive issues concerning the

existence of a duty to warn and whether the warning was sufficiently specific to discharge the

duty are generally reserved for the jury and may be resolved as a matter of law only when the

evidence would not permit differences of opinion by reasonable jurors."  East Penn. Mfg. v.

Pineda, 578 A.2d 1113, 1115 (D.C. 1990).

Ansaldo argues that it did not have a duty to warn because it was merely the seller of a

component part.  See ECF No. 426-1 at 39.  Ansaldo asserts that "[i]t had no duty to warn

WMATA of dangers arising from the use of a product from another manufacturer that had been in use in the WMATA system for 35 years [i.e., the Alstom modules]." Id.  Here, again, Ansaldo's argument is premised on its assertion that the sole cause of the collision was the parasitic oscillation between the Alstom modules.  This misses the point.  It is undisputed here that Ansaldo was aware that its impedance bonds would be paired with Alstom modules.  And there is a factual dispute as to the type of safety analyses undertaken by Ansaldo in ensuring the compatibility of its bonds with Alstom's modules and, similarly, disputes as to Ansaldo's knowledge regarding the possible hazards attendant to the mixed configuration track circuits. See ECF No. 480 at 41.  Accordingly, in light of the factual disputes as to Ansaldo's actions and knowledge regarding mixed track circuits, the question of Ansaldo's duty to warn is proper for decision by a jury.  See East Penn. Mfg., 578 A.2d at 1115.

>    ii.    **Can the Court conclude as a matter of law that WMATA was a
>           "sophisticated user" that should have known about the defect, thus
>           absolving Ansaldo of any duty to warn?**

In the alternative, Ansaldo argues that even if it did have a duty to warn, its duty was negated by the fact that WMATA was a sophisticated user.  ECF No. 426-1 at 39, 41-44.  "[T]he 'experienced user' exception to the duty to warn is properly viewed as a form of the 'knowledge of danger' rule."  East Penn Mfg., 578 A.2d at 1120.  And "[b]ecause it focuses on actual or constructive knowledge—what the user knew or reasonably should have known—the applicability of the 'experienced user' exception to the duty to warn is a question of fact for the jury when the extent of the [user's] knowledge is in dispute."  Id.

Here, as the plaintiffs point out, the WMATA-Ansaldo contract, in which Ansaldo was expressly informed that the bonds would be used in mixed configuration circuits and tasked with ensuring compatibility, suggests that WMATA was relying on Ansaldo's expertise—not that

42

Ansaldo could rely on WMATA's expertise.  See ECF No. 482 at 42.  Indeed, "WMATA disputes Ansaldo's arguments that [its knowledge was] superior to [Ansaldo,] the designer and manufacturer of track circuit signaling components."  ECF No. 480 at 41; see also ECF No. 480-1 ¶ 116 (collecting deposition testimony from various WMATA engineers and technicians as to their knowledge of parasitic oscillation and the attendant safety concerns).  Accordingly, in light of the factual disputes regarding the knowledge and expertise of the user, the Court cannot decide as a matter of law that WMATA was a sophisticated user, thus obviating Ansaldo's duty to warn.

### 4.    The derivative claims of wrongful death and survival

Because the underlying counts are not being dismissed, Ansaldo is not entitled to summary judgment on the derivative claims of wrongful death and survival based upon the non-existence of the required substantive claims.

## VII.  Alstom's Motion for Summary Judgment[18]

### A.    Introduction

In this motion for summary judgment, Alstom notes that the Court's June 22, 2011 Memorandum Opinion dismissed all claims against Alstom in its capacity as a designer of the track equipment as time-barred under the District's statute of repose.  Relying on this ruling, Alstom asserts that all of the claims and cross-claims against it are, at root, design defect claims

---

[18] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) Defendant Alstom Signaling, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment [ECF No. 427-1]; (2) Ansaldo STS USA, Inc.'s Opposition to Alstom Signaling, Inc.'s Motion for Summary Judgment [ECF No. 479]; (3) the Plaintiffs' Opposition to Defendant Alstom Signaling Inc.'s Motion for Summary Judgment [ECF No. 484]; (4) WMATA's Memorandum in Opposition to Alstom Signaling, Inc.'s Motion for Summary Judgment [ECF No. 485]; and (5) Alstom's Reply in Support of its Motion for Summary Judgment [ECF No. 551].

and must fail.  Alternatively, Alstom argues that, even if the failure to warn claims are not barred on the basis of being design defect claims, it had no duty to warn.  Next, Alstom asserts that because there is no basis for finding it liable for the June 22, 2009 collision, it is entitled to summary judgment on the plaintiffs' derivative wrongful death and survival statute claims, the co-defendants' contribution cross-claims, and WMATA's contractual indemnification cross-claim.

The Court concludes that because its June 22, 2011 Memorandum Opinion explicitly found that Alstom could be found liable in its role as a manufacturer and seller—as opposed to designer—the statute of repose does not bar the plaintiffs' remaining claims.  The Court further finds that there are disputed issues of fact as to (1) when Alstom became aware of the parasitic oscillation in its modules, and (2) whether a letter sent by Alstom can be construed as a warning.  And because the claims asserting primary liability against Alstom remain, there is no basis for dismissing the derivative claims against it.  Accordingly, Alstom's motion for summary judgment is denied in its entirety.

## B.     Background

In addition to information set forth above about the general history of WMATA (e.g., the Metrorail system's construction in the 1970s), and the structure and components of the Automatic Train Control system, two other pieces of undisputed background are important to the resolution of this motion.  First, in a September 7, 2004 letter sent marking the recent celebration by Alstom of its 100th year of business, Alstom represented that "over the past two years, there has been an increasing trend of extraordinary events involving Alstom electromechanical products that we feel is critical now to discuss with our customers."  ECF No. 484 at 8.  Second, in 2005, "in a tunnel near [WMATA's] Rosslyn [Metrorail] station, three WMATA trains nearly

44

[collided] because there was a loss of shunt that led to trains being given maximum speed commands." Id. at 12. Then, about a week later, WMATA identified a track circuit near its Silver Spring station that was similarly failing to detect trains. Id. WMATA requested the assistance of Alstom engineers in investigating these incidences, and Alstom twice sent the same engineer to assist WMATA in conducting its investigation. Id. at 12-13.

## C.   Analysis

### 1.   Does the Court's June 22, 2011 Memorandum Opinion foreclose the plaintiffs' claims against Alstom?

In its June 22, 2011 Memorandum Opinion, the Court concluded that "Alstom's arguments that the plaintiffs' negligence and strict products liability claims (Counts 7, 9, 10, and 14 of the Master Complaint and Counts 1, 2, 3, and 8 of the McMillan Estate Complaint) [had to] be dismissed as barred by the statute of repose fail, except to the extent that these claims extend to Alstom in its capacity as a designer." In re Fort Totten Metrorail Cases, 793 F. Supp. 2d 133, 156 (D.D.C. 2011); see also id. at 142 n.10 ("A product may have a defective design without being defectively manufactured, and vice versa. Therefore, dismissing the design defect claims against Alstom would limit its liability to manufacturing defects only."). Thus, the Court has already ruled that the claims against Alstom in its capacity as the manufacturer and seller of the modules are not barred by the statute of repose.

### 2.   The Plaintiffs' Manufacturing Defect Claims

"In a manufacturing defect case, plaintiff may seek to prove either a 'specific defect'— that is, that a specific, identifiable part of the [product] was defective and was the cause of the accident—or a 'general defect'—which, more accurately, is an unspecified defect, which the plaintiffs ask the finder of fact to infer from the accident itself." Pappas v. Ford Motor Co., 7 F.

Supp. 2d 22, 26 (D.D.C. 1998). "To prove a specific defect . . . , plaintiffs generally introduce

expert testimony based on an examination of the accident." Id. "To prove an unspecified defect,

plaintiffs generally introduce circumstantial evidence, and expert opinion based thereon, that

some defect attributable to the manufacturer must have been the cause of the accident." Id.

Although it is unclear whether the plaintiffs maintain that the parasitic oscillation

constitutes a specific defect or a general defect, there is sufficient evidence of parasitic

oscillation within the Alstom modules at B2-304 from which a jury could either (1) conclude that

the modules were defective and were a cause of the accident, or (2) infer, based on the evidence

presented with regard to the structure of a track circuit and the nature of the collision, that the

modules were defective. See ECF No. 485-1 ¶¶ 38W, 39W (explaining parasitic oscillation, why

it is dangerous, and opining what Alstom should have done to remedy the problem of oscillating

modules). Alstom is therefore not entitled to summary judgment on the manufacturing defect

claims.

### 3.      The Plaintiffs' Failure to Warn Claims

There are several instances from which a reasonable jury could conclude that Alstom had

a duty to warn that it breached.[19] First, in the 1970s, Alstom entered into a contractual

relationship with WMATA and thereby acquired the duty to use reasonable care in performing

its contractual obligations. See Bechtel, 631 F.2d at 1001. Next, a reasonable jury could

conclude that Alstom's September 2004 letter evinced knowledge of the dangers of mixed track

circuits. Finally, because "even if there is no duty to warn at the time of sale, facts may

thereafter come to the attention of the manufacturer which make it imperative that a warning

---

[19] The Court discussed the applicable legal standards for failure-to-warn claims supra at page 41 of this Memorandum Opinion.

then be given," <u>Owens-Illinois, Inc. v. Zenobia</u>, 325 Md. 420, 446 (Md. 1992); <u>see also</u> <u>Ferguson v. F.R. Winkler GMBH & Co.</u>, 79 F.3d 1221, 1226 (D.C. Cir. 1996) (noting that "the Maryland courts . . . have often served as an aid in interpreting the products-liability law of the District of Columbia"), it is arguable that Alstom's participation in the 2005 investigation of the Rosslyn and Silver Spring incidents either gave or should have given Alstom knowledge that parasitic oscillation in its modules was causing issues in train detection.  And, as noted above, "previous decisions [of the District of Columbia Court of Appeals] indicate that fact-intensive issues concerning the existence of a duty to warn and whether the warning was sufficiently specific to discharge the duty are generally reserved for the jury and may be resolved as a matter of law only when the evidence would not permit differences of opinion by reasonable jurors."  <u>East Penn. Mfg.</u>, 578 A.2d at 1115.  Thus, because there is evidence from which a reasonable jury could conclude that Alstom was aware of problems with its modules, Alstom is not entitled to summary judgment on the failure to warn claims.  Moreover, the question of whether Alstom's September 2004 letter constituted a warning, much less a sufficient warning, is a question for a jury.

### 4.      The Plaintiffs' Derivative Survival and Wrongful Death Claims

Because the underlying negligence and strict liability claims are not being dismissed, Alstom is not entitled to summary judgment on the plaintiffs' derivative survival and wrongful death claims based on the erroneous assumption that the underlying claims would not exist.

### 5.      The Co-defendants' Cross-Claims against Alstom

### i.      The Co-defendants' Contribution Claims against Alstom

In light of the foregoing conclusion that a reasonable jury could find Alstom liable to the plaintiffs, Alstom is not entitled to summary judgment on the co-defendants' contribution claims.

### ii.      WMATA's Contractual Indemnity Claim against Alstom

Alstom asserts that it is entitled to summary judgment on WMATA's contractual

indemnity cross-claim for two reasons: (1) that there is no basis for finding Alstom negligent,

and (2) that the WMATA-Alstom contract limits WMATA's indemnity rights "to the period of

time before acceptance of the work, which has long since passed."  ECF No. 427-1 at 22.  Both

of these arguments must be rejected.

First, in light of the foregoing conclusion that a reasonable jury could find Alstom liable

to the plaintiffs, Alstom is not entitled to summary judgment on WMATA's claim for contractual

indemnity.  And because the plaintiffs are not precluded as a matter of law from establishing

Alstom's liability, there is no need to evaluate WMATA's argument that it is not barred from

establishing Alstom's liability to the plaintiffs even if the plaintiffs cannot do so.  See ECF No.

485 at 24 (asserting that two exceptions to the statute of repose permit WMATA to establish

Alstom's liability to the plaintiffs even if plaintiffs are precluded from doing so).

Second, it is not clear from the contract that the parties intended to limit WMATA's

contractual rights to indemnity to the time prior to acceptance of the work performed under the

contract.  In fact, it is clear that they did not so intend.  Article 47 of the WMATA-Alstom

contract provides:

> (a) The Contractor shall save and keep harmless and indemnify the Authority
> against any and all liability claims . . . for injury, including personal injury to or
> death of any person or persons, and for loss or damage to any property; occurring
> in connection with or in any way incident to or arising out of the occupancy, use,
> service, operations, or performance of work in connection with this contract,
> resulting in whole or in part from the negligent acts, errors or omissions of the
> Contractor.
>
> . . .

(b) The Contractor shall procure and maintain, at his own cost and expense, during the entire period of the performance under this contract, the following types of insurance: . . . .

(c) Before the contract will be executed by the Authority, the Contractor shall forward to the Authority for approval a certificate, or certificates, of the insurance required, under the foregoing provisions, including special endorsements. . . . In addition to any provisions hereinbefore required, a provision of such insurance policies shall be that . . . they will be automatically renewed upon expiration and continued in full force and effect until final acceptance by the Authority of all the work covered by the Contract, unless the Authority is given thirty (30) days written notice, before any change or a cancellation is made effective.

. . . .

(g) Any contract of insurance or indemnification naming the Authority . . . shall be endorsed to provide that the insurer will not contend in the event of any occurrence, accident or claim that the Authority or the United States of America . . . are not liable in tort by virtue of the fact of being governmental instrumentalities or public or quasi-public bodies.

ECF No. 427-2 ¶ 65 (emphasis added); see also ECF No. 485-3 at 37.  Subsections (a) and (c) pertain to different topics and each has its own limiting provision that cannot, and should not, be imputed to the other.  Specifically, the indemnification section—subsection (a)—very clearly entitles WMATA to indemnification arising out of the "occupancy, use, service, operations, or performance of work in connection with [the] contract."  Subsection (c), however, just as clearly limits the maintenance of insurance until acceptance of the work performed under the contract. And the text of subsection (c) makes clear that its requirements apply only to "such insurance policies."  Indeed, the word indemnification does not appear in subsection (c).  Accordingly, as it is undisputed that that the Alstom impedance bonds were in use on June 22, 2009, should Alstom be found negligent, WMATA is entitled to contractual indemnification for that negligence. Alstom's claim that it is entitled to summary judgment on WMATA's contractual indemnification cross-claim is therefore rejected.

# VIII.  ARINC's Motion for Summary Judgment[20]

## A.    Introduction

ARINC moves for summary judgment in its favor as to all claims on the following grounds: (1) it is entitled to the government contractor defense under Boyle v. United Technologies Corp., 487 U.S. 500 (1988); (2) there is no evidence of a causal nexus between any alleged defect in ARINC's alarm system and the train collision; (3) the plaintiffs cannot meet their burden of establishing a design defect because they have offered no evidence of an alternative design; (4) the breach of express warranty fails as a matter of law because the plaintiffs did not provide notice of the alleged breach to ARINC; (5) WMATA's contractual indemnity claim fails because the contract's indemnity provision does not establish a "clear intention" that ARINC would indemnity WMATA for WMATA's own negligence; and (6) because ARINC is not a joint tortfeasor, it is entitled to summary judgment on all contribution claims against it.

The Court concludes that (1) ARINC does not qualify for the government contractor defense under Boyle because it has not shown that this case raises "uniquely federal interests"; (2) there is sufficient evidence of causation to create a jury question; (3) there is evidence of an alternative design sufficient to sustain the plaintiffs' design defect claim; (4) the plaintiffs' express warranty claim does not fail for lack of notice; (5) the indemnity provision in the

---

[20] The Court considered the following filings and their supporting exhibits in resolving this motion: (1) Defendant ARINC Incorporated's Memorandum of Points and Authorities in Support of Motion for Summary Judgment [ECF No. 428-51]; (2) Defendant Alstom Signaling, Inc.'s Memorandum of Points and Authorities in Opposition to ARINC's Motion for Summary Judgment [ECF No. 486]; (3) Defendant WMATA's Memorandum in Opposition to Defendant ARINC, Inc.'s Motion for Summary Judgment [ECF No. 488]; (4) the Plaintiff's Opposition to Defendant ARINC Inc.'s Motion for Summary Judgment [ECF No. 489]; and (5) Defendant ARINC Incorporated's Reply to Oppositions to Motion for Summary Judgment Submitted by Plaintiffs, WMATA, and Alstom [ECF No. 552].

contract between WMATA and ARINC does not require ARINC to indemnify WMATA for WMATA's own negligence; and (6) because there is evidence that ARINC is a joint tortfeasor, the contribution claims against it cannot be dismissed.  Accordingly, ARINC's motion is granted in part and denied in part.

**B.      Background**

As explained above, WMATA relies on an Automatic Train Control system to control train movement and direct train operators.  Since the mid-1990s, the Automatic Train Control system used a software package called the Rail Operations Control Software.  ECF No. 486 at 3. Then, in 2003, WMATA contracted with ARINC, "a provider of communications and engineering solutions to at least 15 to 20 major metrorail systems in the United States," to update the system with ARINC's Advanced Information Management software.  Id.  The WMATA-ARINC contract made clear that the new software should exceed the functionality of the old software and emphasized that the new software should maintain the highest levels of safety and reliability.  Id. at 4.

The Advanced Information Management software collects data from over 50,000 data points—including train circuits—and was designed to alert WMATA to the existence of dangerous conditions.  Id. at 3-4.  The software issues two types of alarms for failed track circuits: (1) a "track circuit failed vacant" alarm, which indicates that a train is in the circuit but the circuit is not reporting a train present, and is also known as a non-reporting block; and (2) a "track circuit failed occupied," alarm, which means that the circuit is indicating the presence of a train despite the fact that the circuit is empty.  Id. at 4.

The following facts regarding ARINC's Advanced Information Management software are undisputed.  First, the software designated the non-reporting block alarm as a "minor alarm."  Id.

51

at 4.  This means that the alarm is deleted by the system if not acknowledged by a user within 60 seconds.  Id.  For all of its other mass transit customers, however, ARINC had classified non-reporting block alarms as major alarms.  Id. at 8.  Second, although ARINC designed the software for WMATA to issue a non-reporting block alarm 35 seconds after the event occurred (meaning that if the circuit malfunctioned for 34 seconds and then self-corrected, no alarm would ever be issued), it designed software for other transit systems that contains a much shorter delay before issuing a non-reporting block alarm—only 5 to 10 seconds.  Id. at 5.  Third, ARINC's Advanced Information Management software would remove trains from its system while the trains were in service, without explanation and without issuing alarms for the Operations Central Control operators.  Id.  WMATA noticed this problem before the new software was fully implemented and informed ARINC that it considered disappearing trains a major safety issue.  Id.  Finally, ARINC's Advanced Information Management software was in operation when the train collision occurred on June 22, 2009.  Id. at 2.

C.    **Analysis**

1.    **Is ARINC entitled to the government contractor defense established in Boyle v. United Technologies Corp., 487 U.S. 500 (1988)?**

ARINC contends that all of the claims against it should be dismissed because it is entitled to the government contractor defense recognized in Boyle v. United Technologies Corp., 487 U.S. 500 (1988).  ECF No. 428-51 at 9.  In Boyle, a "Marine helicopter copilot, was killed when the . . . helicopter in which he was flying crashed off the coast of Virginia Beach, Virginia, during a training exercise."  487 U.S. at 502.  "Although Boyle survived the impact of the crash, he was unable to escape from the helicopter and drowned."  Id.  His estate filed suit under Virginia tort law against the helicopter manufacturer, alleging that the helicopter's emergency

escape hatch was defectively designed.  Id. at 503.  The helicopter manufacturer argued that the

door was provided in accordance with Department of Defense specifications and that,

consequently, the plaintiff's state tort claims were federally preempted.  See id. at 509.  The

Supreme Court agreed.  Id.

The Supreme Court began its analysis by explaining that "a few areas, involving

'uniquely federal interests,' are so committed by the Constitution and laws of the United States

to federal control that state law is pre-empted and replaced, where necessary, by . . . 'federal

common law.'"  Id. at 504 (emphasis added).  It noted that the dispute in Boyle bordered upon

two areas that the Court had previously identified as involving "uniquely federal interests" to

which federal common law applied: (1) "the obligations to and rights of the United States under

its contracts," and (2) "the civil liability of federal officials for actions taken in the course of their

duty."  Id. at 504-05 (citations omitted).  The Court found that "the reasons for considering these

closely related areas to be of 'uniquely federal' interest apply as well to the civil liabilities

arising out of the performance of federal procurement contracts."  Id. at 505-06.

The Court thus deemed "the procurement of equipment by the United States . . . an area

of uniquely federal interest."  Id. at 507.  However, this "merely establishe[d] a necessary, not a

sufficient, condition for the displacement of state law."  Id.  "Displacement will occur only

where . . . a 'significant conflict' exists between an identifiable 'federal policy or interest and the

[operation] of state law, or the application of state law would 'frustrate specific objectives' of

federal legislation."  Id. (citations omitted).  The Boyle Court found such a "significant conflict"

between state law and federal interests under the facts of that case.  See id. at 509.  In

determining the parameters of this conflict, the Court looked to the discretionary function

exception of the Federal Tort Claims Act, which exempts the United States from liability for

claims "'based upon the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of a federal agency or employee of the Government,

whether or not the discretion involved be abused.'"  Id. at 511 (quoting 28 U.S.C. § 2680(a)).

Because "the selection of the appropriate design for military equipment to be used by our Armed

Forces is assuredly a discretionary function within the meaning of this provision," and because

"permitting 'second-guessing' of these judgments through state tort suits against contractors

would produce the same effect sought to be avoided by the FTCA exemption" insofar as

contractors would pass through the financial burden of adverse judgments to the United States,

the Court concluded that "that state law which holds Government contractors liable for design

defects in military equipment does in some circumstances present a 'significant conflict' with

federal policy and must be displaced."  Id. at 511-12 (citation omitted).  The Court then

established the following three-part test to determine the "scope of displacement" of state law:

> Liability for design defects in military equipment cannot be imposed, pursuant to
> state law, when (1) the United States approved reasonably precise specifications;
> (2) the equipment conformed to those specifications; and (3) the supplier warned
> the United States about the dangers in the use of the equipment that were known
> to the supplier but not to the United States.

Id. at 512.

ARINC jumps directly to this three-part test in its opening brief, arguing that it is entitled

to the government contractor defense because it designed its Advanced Information Management

system in conformance with specifications approved by WMATA and that WMATA was aware

of any dangers associated with the system.  See ECF No. 428-51 at 10-22.  But ARINC

overlooks the two prerequisites to invoking the Boyle defense: "first, the case must involve 'an

area of uniquely federal interest'; and second, there must exist 'a significant conflict . . . between

an identifiable federal policy or interest and the [operation] of state law.'"  Kormendi/Gardner

Partners v. Surplus Acquisition Venture, LLC, 606 F. Supp. 2d 114, 117 (D.D.C. 2009) (quoting

Boyle, 487 U.S. at 507); accord Glassco v. Miller Equip. Co., 966 F.2d 641, 642 (11th Cir. 1992)

(stating that government contractors seeking to invoke the Boyle defense must first satisfy both

the "uniquely federal interest" and "significant conflict" prongs, and explaining that the "three-

part inquiry elaborates the 'significant conflict' prong of the test").  Moreover, "[t]he party

seeking to displace state law bears the burden of demonstrating that both conditions exist."

Kormendi/Gardner Partners, 606 F. Supp. 2d at 117.  The Court concludes for the following

reasons that ARINC has failed to carry its burden of showing that this case raises uniquely

federal interests.

        Courts have found uniquely federal interests in a variety of cases involving federal

government contractors.  See, e.g., Boyle, 487 U.S. at 507 (liability arising from federal

procurement contracts); Saleh v. Titan Corp., 580 F.3d 1, 5, 9 (D.C. Cir. 2009) (liability arising

from military contractors' participation in combatant activities over which the military retains

command authority); In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 197 (2d Cir.

2008) (coordination of "federal disaster assistance and streamlining the management of large-

scale disaster recovery projects"); Hudgens v. Bell Helicopters v. Textron, 328 F.3d 1329, 1334

(11th Cir. 2003) (maintenance of U.S. military aircraft according to procedures specified by the

federal government).  The common thread of all these cases is that "the interests of the United

States [would] be directly affected" by the imposition of state tort liability on the contractor.

Boyle, 487 U.S. at 507.

        The biggest obstacle for ARINC in claiming the government contractor defense under

Boyle is that it contracted with WMATA, not the federal government.  Recognizing this

distinction, ARINC asserts that uniquely federal interests are nonetheless at stake here because

(1) the interstate compact creating WMATA has been deemed an Act of Congress; (2) Congress

has taken an active role in creating and funding WMATA; (3) the federal government is

dependent upon WMATA to transport federal employees in the Washington, D.C. metropolitan

area;[21] and (4) courts have applied federal common law to immunity issues involving WMATA.

See ECF No. 552 at 6-9.

The Court finds ARINC's arguments unpersuasive.  True, the federal government may

have some general interest and involvement in WMATA's operations and its success, and courts

have applied federal common law to certain immunity issues involving WMATA.  But these

truisms are beside the point.  The relevant inquiry under Boyle is whether "the interests of the

United States [would] be directly affected" by imposing tort liability on ARINC for designing its

Advanced Information Management system in conformance with specifications approved by

WMATA.  Boyle, 487 U.S. at 507 (emphasis added).  In Boyle, for instance, the Court found it

"plain that the Federal Government's interest in the procurement of equipment is implicated by

suits such as the present one" because "[t]he imposition of liability on Government contractors

will directly affect the terms of Government contracts: either the contractor will decline to

manufacture the design specified by the Government, or it will raise its price.  Either way, the

interests of the United States will be directly affected."  Id. at 506-07.  Here, ARINC has not

shown that imposing liability upon it will have any effect on the United States's interests, much

less a direct one.  It simply lists all the connections that WMATA has to the federal government.

That is not enough to establish preemption of state tort claims under Boyle.

---

[21] Ironically, the federal government's purported interest in transportation for its employees is actually advanced (rather than undermined) by state tort suits against WMATA's contractors which seek to expose harmful defects in WMATA's transit system.  ARINC seemingly overlooks this reality.

This case is more like <u>Miree v. DeKalb County</u>, 433 U.S. 25 (1977), than <u>Boyle</u>.  <u>Miree</u>

concerned "whether certain private parties could sue as third-party beneficiaries to an agreement

between a municipality and the Federal Aviation Administration."  <u>Boyle</u>, 487 U.S. at 506 (citing

<u>Miree</u>, 433 U.S. at 30).  The Supreme Court held that federal common law did not govern the

case based on its conclusion that "the resolution of petitioners' breach-of-contract claim against

respondent [would] have no direct effect upon the United States or its Treasury."  <u>Miree</u>, 433

U.S. at 29; <u>see</u> <u>id.</u> at 32-33 ("'[A]ny federal interest in the outcome of the [dispute] . . . is far too

speculative, far too remote a possibility to justify the application of federal law.'" (citation

omitted)).  As in <u>Miree</u>, the claims against ARINC will have no direct effect on the United States

or its Treasury, nor does the United States have any other discernible interest in this case.  The

Court therefore rejects ARINC's attempt to invoke the <u>Boyle</u> government contractor defense,

and will preclude ARINC from pursuing this affirmative defense at trial.

### 2. Can the Court conclude, as a matter of law, that the Advanced Information Management System was not a proximate cause of the collision?

As noted above, "[p]roximate cause has been defined as that cause which, in natural and

continual sequence, unbroken by any efficient intervening cause, produces the injury, and

without which the result would not have occurred."  <u>Convit</u>, 980 A.2d at 1125.  It is only the

"<u>exceptional</u> case" in which questions of proximate cause "pass from the realm of fact to one of

law."  <u>Majeska</u>, 812 A.2d at 950 (emphasis added).

ARINC argues that the plaintiffs' "causation argument with regard to ARINC is that if

the [Advanced Information Management] system were free of the defects they identified, one of

the [Operations Central Control] supervisors would have communicated with the operator of

Train 112 to warn her of the non-reporting block at Fort Totten and the accident would have

been avoided." ECF No. 428-51 at 23-24. ARINC maintains that the plaintiffs' claim must fail

because WMATA had no procedure requiring the Operations Central Control supervisors to

route trains around a non-reporting block and thus a better alarm would not have prevented the

accident. Id. WMATA responds, however, that it "had an absolute block procedure for routing

trains around locations that were experiencing actual loss of train detection." ECF No. 488 at 26.

Accordingly, there is a factual dispute as to how WMATA would have responded had the

Advanced Information Management software accurately notified the Operations Central Control

personnel of the problem at Circuit B2-304. See ECF No. 488-2 ¶¶ 117-19. Moreover, there is

sufficient other evidence from which a reasonable jury could conclude that ARINC's software

was a proximate cause of the accident: its tendency to delete trains, the delay on issuing a non-

reporting block alarm, its designation of a non-reporting block alarm as minor, and the sheer

number of alarms generated by the system. See, e.g., id. ¶¶ 94, 118-19

### 3. Absence of Evidence of a Safer Alternative Design in Support of Design Defect Claim

ARINC next asserts that it is entitled to summary judgment on the plaintiffs' design

defect claim because the plaintiffs "have failed to identify an expert to testify as to the existence

of an alternative design" to its Advanced Information Management system. ECF No. 428-51 at

32. The Court does not agree.

Whether or not the claim of defective design is premised on negligence or strict liability,

a plaintiff must show the risks, costs, and benefits of the product in question, as well as an

alternative design. See Hull v. Eaton Corp., 825 F.2d 448, 453-54 (D.C. Cir. 1987). With

respect to the safer alternative design of the allegedly defective product, "[a]ll that is required is

that it be commercially feasible at the time of manufacture."  Artis v. Corona Corp. of Japan, 703 A.2d 1214, 1217 (D.C. 1997).

Here, the plaintiffs and co-defendants maintain that not only was an alternative design commercially feasible, but that ARINC was itself manufacturing alternatively designed software systems for operators of other mass transit systems. See, e.g., ECF No. 486 at 8 (asserting that ARINC should have designed the Advanced Information Management software to designate non-reporting block alarms as major, and opining that this "is a commercially feasible design, as is best evidenced by the fact that every other transit system ARINC works with makes" such alarms major alarms).  Accordingly, as there are disputed issues of material fact with regard to the feasibility of an alternative design, ARINC is not entitled to summary judgment on the design defect claims asserted against it.

### 4.    The Plaintiffs' Express Warranty Claim

"In order to succeed on a breach of warranty claim, a plaintiff must prove notice as well as that the defendant breached an express promise made about the product sold."  Witherspoon v. Philip Morris, Inc., 964 F. Supp. 455, 464 (D.D.C. 1997).  "[T]he purpose of the notice requirement is to open the doors to negotiation"; accordingly, a plaintiff need not "threaten litigation in order to provide notice."  Id. (citing Rock Creek Ginger Ale Co., Inc. v. Thermice Corp., 352 F. Supp. 522, 528 (D.D.C. 1971).  "Constructive notice, if established, will satisfy the requirement."  Id.  Finally, "when a seller willfully fails to disclose a defect, failure to notify cannot be raised as a defense."  Id. at 465 (internal quotation marks and citation omitted).

ARINC contends that the plaintiffs' breach of express warranty claim fails because "no claim for breach of an express warranty may be made absent notice to ARINC of the alleged breach," and because "neither WMATA nor Plaintiffs provided ARINC with the required notice

at any time prior to the accident."  ECF No. 428-51 at 33.  WMATA responds by arguing: (1) that ARINC cannot prove as a matter of law that the warranty language cited in ARINC's motion is controlling, ECF No. 488 at 35; (2) that ARINC cannot establish that the warranty language it cites is enforceable as a matter of law, id. at 36; (3) that ARINC was provided with constructive notice of problems with the Advanced Information Management system, id. at 39; and (4) that ARINC was not entitled to notice, id. at 40.  Because ARINC's motion focuses only on the argument that no notice was provided and does not appear to assert that no warranty was made, the Court will address only the latter two of WMATA's arguments.

Here, WMATA argues that, drawing all reasonable inferences in its favor, there is a question of fact as to whether ARINC received constructive notice.  Alternatively, WMATA maintains that ARINC was not entitled to notice because it willfully failed to disclose defects in its Advanced Information Management system.  Either one of these arguments suffices to preclude the Court from granting summary judgment to ARINC on the breach of express warranty claims.  First, WMATA raised the issue of the disappearing train with ARINC and made clear that it considered this to be a major safety issue.  See ECF No. 486 at 5-6.  Second, WMATA maintains that ARINC failed to disclose several aspects of the Advanced Information Management software that deviated from the software used by other operators of mass transit systems.  See id. at 5, 8-9.  Accordingly, whether ARINC received constructive notice and whether ARINC willfully failed to disclose defects and was therefore not entitled to notice are questions that must be answered by a jury.

### 5.    WMATA's Contractual Indemnity Claim Against ARINC

Although "[o]ne of the most common, and simple bases of indemnity is a contract that provides for it," East Penn Mfg., 578 A.2d at 1126, "[a]n indemnity provision . . . 'should not be

construed to permit an indemnitee to recover for his . . . own negligence unless the court is

<u>firmly convinced</u> that such an interpretation reflects the intention of the parties,'" <u>W.M.</u>

<u>Schlosser Co., Inc. v. Maryland Drywall Co., Inc.</u>, 673 A.2d 647, 653 (D.C. 1996) (quoting

<u>United States v. Seckinger</u>, 397 U.S. 203, 211 (1970)) (emphasis added).  Indeed, "[i]f a party

'expects to shift responsibility for its negligence . . . the mutual intention of the parties to this

effect should appear <u>with clarity</u> from the face of the contract.'"  <u>Schlosser</u>, 673 A.2d at 653

(quoting <u>Seckinger</u>, 397 U.S. at 211) (emphasis added).

In Count 6 of its cross-claim, WMATA seeks contractual indemnification from ARINC

in the event that WMATA is found liable to the plaintiffs.  <u>See</u> ECF No. 428-51 at 36 (citing

ECF No. 140 at 20).  ARINC explains that "on its face, WMATA's claim includes

indemnification for [WMATA's] own negligent acts," and maintains that it has "no obligation to

indemnify WMATA for [WMATA's] own negligence in the absence of clear contractual

language to the contrary, which does not exist here."  <u>Id.</u>  The Court agrees.

The pertinent section of the ARINC-WMATA contract reads:

> The Contractor will save and keep harmless and indemnify WMATA against any
> and all liability claims, and the cost of whatsoever kind and nature arising or
> alleged to have arisen for injury, including personal injury to or death of person or
> persons, and for loss or damage occurring in connection with this Contract and or
> any acts in connection with activities to be performed under this Contract
> <u>resulting in whole or in part from the acts, errors or omissions of the contractor, or</u>
> <u>any employee, agent or representative of the Contractor.</u>

<u>Id.</u> (emphasis added).

WMATA argues that "a plain reading of the provision [following the words 'and or'] is

that the language pertaining to ARINC's own acts, errors, or omissions is part of an 'in addition

to' or 'alternative' clause," and contends that the words "and or" are "intended to broaden the

indemnity, not limit it as ARINC argues."  ECF No. 488 at 41-42.  The Court, however, has

struggled to make heads or tails of this section of the contract, much less conclude that any sort of "plain reading" may be made of it.  On this poorly drafted contractual language, the Court is far from "firmly convinced," <u>Schlosser</u>, 673 A.2d at 653, that ARINC intended to permit WMATA to receive indemnification from ARINC for losses resulting from WMATA's own negligence.  By way of brief example, the reading urged by WMATA makes no sense as it renders the "and or" clause entirely superfluous.  Indeed, negligent acts on the part of the contractor are seemingly encompassed by the phrase "any and all liability claims . . . occurring in connection with this Contract."  The Court is therefore unclear how the "and or" clause broadens the indemnity requirement as WMATA urges.  <u>See</u> ECF No. 488 at 41.  Next, the Court has trouble interpreting the differing meanings—if, in fact, any were intended—by the language "occurring in connection with this Contract'' and "to be performed under this Contract."  And as these two differing temporal phrases are central to the two clauses, it would appear the parties meant to establish limitations on the resulting indemnity obligation.  Accordingly, ARINC is entitled to summary judgment on WMATA's cross-claim for contractual indemnification to the extent that WMATA seeks indemnification from ARINC for WMATA's own negligence, should a jury determine that WMATA was negligent.

### 6.        The Co-defendants' Contribution Claims Against ARINC

Because the Court is not granting summary judgment to ARINC on the plaintiffs' claims against it, there is no basis to grant ARINC summary judgment on the co-defendants' contribution cross-claims, as a reasonable jury could deem ARINC a joint tortfeasor responsible for the June 22, 2009 collision.

### IX.  <u>Conclusion</u>

For the foregoing reasons, (1) WMATA's motion to dismiss Alstom's statute of repose defense is granted in part and denied in part; (2) Ansaldo's motion for judgment on Counts 7, 11, and 15 of the Second Amended Master Complaint is granted; (3) WMATA's motion to dismiss the equitable indemnification cross-claims against it is granted; (4) the corporate defendants' motion for summary judgment is denied; (5) Ansaldo's motion for summary judgment is denied; (6) Alstom's motion for summary judgment is denied; and (7) ARINC's motion for summary judgment is granted in part and denied in part.

**SO ORDERED** this 16th day of August, 2012.[22]

REGGIE B. WALTON
United States District Judge

---

[22] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.